**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE: REALPAGE, INC., RENTAL** | ) | **NO. 3:23-md-03071** |
| **SOFTWARE ANTITRUST** | ) | MDL No. 3071 |
| **LITIGATION (NO. II)** | ) | |
| | ) | **THIS DOCUMENT RELATES TO**: |
| | ) | **3:22-cv-01082** |
| | ) | **3:23-cv-00357** |
| | ) | **3:23-cv-00332** |
| | ) | **3:23-cv-00410** |
| | ) | **3:23-cv-00742** |

## MEMORANDUM OPINION

Pending before the Court is the Multifamily Defendants' (hereinafter "Defendants") Motion to Enforce Class Action Waivers (Doc. No. 590). The Motion seeks to enforce class action waivers in leases between certain Defendants and specific named Plaintiffs, including Brandon Watters, Jeffery Weaver, Joshua Kabisch, Meghan Cherry, and Selena Vincin. If granted, the motion would strike class actions allegations as to these Plaintiffs. Defendants urge the Court to enforce these waivers now because eight Defendants are named only in cases brought by one or more of these Plaintiffs, (Doc. No. 591 at 6-7), so they can avoid the burden of class discovery altogether. (Id.). The Court will grant in part and deny in part the motion (Doc. No. 590), because certain waivers may not apply at all, and most of the name Plaintiffs entered into other leases after 2016 without a class action waiver.

### BACKGROUND

The following allegations from the Multifamily Plaintiffs' Second Amended Complaint ("Multifamily Complaint") (Doc. No. 530) are considered as true to resolve the pending motion.

RealPage, Inc. ("RealPage") developed an "integrated technology platform that provides software solutions for the multifamily housing market." (Doc. No. 530 ¶ 2). RealPage rolled out

its first revenue management software, YieldStar, after acquiring it from Camden Property Trust in 2002. (Id. ¶ 209). From 2002 to early 2016, YieldStar operated as a rent advisory service. (Id. ¶ 212). In early 2016, RealPage transitioned YieldStar to become a "rent-setting software." (Id.). RealPage then acquired Lease Rent Options ("LRO") from Rainmaker Group in 2017. (Id. ¶ 26). It integrated LRO and YieldStar into a "unified platform." (Id. ¶ 221). In 2020, RealPage launched AI Revenue Management ("AIRM"), a "combination of its legacy revenue management platforms [YieldStar and LRO] and a super-charged price optimization and revenue management tool." (Id. ¶ 221). Today, RealPage operates a full suite of revenue management services, which also includes RealPage Revenue Management ("RPRM") (collectively the "Revenue Management Solutions" or "RMS"). (Id. ¶ 2).

RealPage's clients include owners of residential properties ("Owners"), companies that serve as both owners and operators of residential properties ("Owner-Operators"), and property management companies ("Managers"). (Id. ¶ 3). These companies are horizontal competitors. (Id. ¶ 6). As of December 2020, RealPage "had over 31,700 clients, including owner operators and each of the 10 largest multifamily property management companies in the United States." (Id. ¶ 61 (internal quotations omitted)).

The Multifamily Plaintiffs allege that RealPage and its clients have formed an illegal price-fixing cartel. (See id. ¶ 6). It begins when RealPage touts its ability to help clients obtain the optimal price for housing units regardless of other normal market forces. (Id. ¶ 4). RealPage's clients each separately contract with RealPage, paying RealPage periodic fees and, critically, providing RealPage their independent commercially sensitive pricing data. (Id. ¶¶ 5, 13). RealPage then applies its revenue management algorithm to this data pool of competitor information to "recommend" optimal rent prices for each of RealPage's clients, which is then

available for each RealPage client to apply to multifamily and student apartment units in each of the markets where those clients are located. (Id. ¶ 4). To be sure, not all RealPage clients utilize RealPage's entire RMS suite; for example, some use only LRO while others have used YieldStar, LRO, and AIRM. (See, e.g., id. ¶¶ 70, 85, 88, 124). But regardless of which services a client subscribes to, by "no later than 2020, . . . all RealPage RMS were combined into a single unified database." (Id. ¶ 222).

By using the RMS, RealPage's clients are able to "price their units according to their collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive environment." (Id. ¶ 11). They do this by 1) collectively agreeing to price their rental units in accordance with RealPage's RMS pricing recommendations, (Id. ¶¶ 11, 15), and 2) controlling the supply of rental units by "allow[ing] a larger share of their units to remain vacant," (id. ¶ 31), and staggering lease renewals to "minimize naturally occurring periods of oversupply." (Id. ¶ 36). This collective behavior, driven by RealPage's pricing recommendations, has resulted in "parallel pricing that cannot be explained by typical economic factors" among the Owners, Owner-Operators, and Managers who use RealPage's RMS. (Id. ¶ 22). Additionally, between March 2015 and March 2023, "increased usage of RealPage's RMS corresponds with increasing rents over th[e] same period." (Id. ¶ 21).

Allegations specific to the five Plaintiffs relevant to the motion are as follows:

### 1. Brandon Watters

From 2019 until August 2021, Watters was subject to a lease for an apartment from Defendant UDR, Inc. in Brentwood, Tennessee, that did not contain any class action waiver. (Doc. No. 530 ¶ 54). UDR, Inc. used RealPage RMS to recommend rent prices for that property. (Id.). Beginning in August 2021 until the end of 2022, Watters leased an apartment at 2010 West End in Nashville, Tennessee, owned by non-party DRI/CA Nashville, LLC and managed by Defendant

3

Lincoln Property Company and non-party Pegasus Property Management. (Id.; Doc. No. 590-1 at 7). The lease constituted "the entire agreement between [Watters] and [DRI/CA Nashville, LLC]" and incorporated "any addenda or amendments [Watters] sign[ed] as part of executing th[e] [l]ease." (Doc. No. 590-1 at 13). An unsigned Class Action Addendum to the lease contains the class action waiver:

> **Class Action Waiver.** You agree that you hereby waive your ability to participate either as a class representative or member of any class action claim(s) against us or our agents. While you are not waiving any right(s) to pursue claims against us related to your tenancy, you hereby agree to file any claim(s) against us in your individual capacity, and you may not be a class action plaintiff, class representative, or member in any purported class action lawsuit ("Class Action"). Accordingly, **you expressly waive any right and/or ability to bring, represent, join, or otherwise maintain a Class Action or similar proceeding against us or our agents in any forum.**
>
> **Any claim that all or any part of this Class Action waiver provision is unenforceable, unconscionable, void, or voidable shall be determined solely by a court of competent jurisdiction.**
>
> **YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU MAY HAVE POSSESSED THE ABILITY TO BE A PARTY TO A CLASS ACTION LAWSUIT. BY SIGNING THIS AGREEMENT, YOU UNDERSTAND AND CHOOSE TO WAIVE SUCH ABILITY AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY. THIS CLASS ACTION WAIVER SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE CONTRACT.**

(Doc. Nos. 590-1 at 45 (emphasis in original)). The lease specified that "you" referred to Watters, and both "us" and "owner" referred to "DRI/CA Nashville, LLC." (Doc. No. 590-1 at 7).

### 2. Joshua Kabisch

Kabisch entered into a lease for an apartment in at The Cooper in Chicago, Illinois, from April 2019 to July 2020, which was managed by Defendant Bozzuto Management and used

4

RealPage RMS to price units. (Doc. No. 530 ¶ 57). This lease did not contain a class action waiver. Between June 2022 and June 2023, Kabisch rented a residential unit at Harlowe in Nashville, Tennessee, which was owned and managed by Defendant Greystar Management Services, LLC ("Greystar"). (Id.). Greystar used RealPage RMS at Harlowe. (Id.). The lease for his Nashville apartment contained a class action waiver identical to that in Watters' lease, which Kabisch electronically signed. (Doc. No. 590-3 at 38 (emphasis in original)). In his lease, "you" referred to Kabisch, and both "us" and "owner" referred to "Gulch, LLC," a non-party to this case. (Doc. No. 590-3 at 7).

### 3. Meghan Cherry

Cherry rented an apartment in Seattle, Washington, managed by Greystar, known as Summit at Madison Park, from August 2018 through August 2019. (Doc. No. 530 ¶ 58). Greystar used RealPage RMS in managing the Summit. (Id.). Although her initial lease contained no class action waiver, when she renewed her lease to cover November 2019 until August 2020, it contained a class action waiver identical to those in Watters' and Kabisch's leases. (Doc. No. 590-3 at 169 (emphasis in original)). In her lease renewal, "you" referred to Cherry (under a former name), and both "us" and "owner" referred to "Madison Summit LLC," a non-party to this case. In July 2020, Cherry entered into a different lease for property in Seattle managed by Defendant Essex Property Trust Inc., which used RealPage RMS for pricing; that lease contains no class action waiver.

### 4. Jeffery Weaver

Weaver rented an apartment unit at Belleview Station Community in Denver, Colorado, from April 2017 to September 2020. During that time, Defendant Camden Property Trust

("Camden") owned and managed the property and used YieldStar to price units. (Id.). Each of his three annual leases contained the following provision:

> ***Default by Owner.*** Owner agrees to abide by applicable law regarding repairs and performance under this Lease. ALL REQUESTS FOR REPAIRS MUST BE IN WRITING. Unless exercising a right specifically granted by applicable law, Resident shall not be entitled to any abatement of Rent for any inconvenience or annoyance in connection with Owner's repairs or maintenance and may not withhold Rent under any circumstances, regardless of any alleged failure by Owner to repair or maintain, unless otherwise provided by applicable law. **To the extent allowed by applicable law, Resident waives any ability or right to serve as a representative party for others similarly situated or participate in a class action suit or claim against the Owner or the Owner's managing agents. Resident acknowledges that this waiver does not, in any way, affect Resident's right to pursue any rights or remedies Resident may have against Owner as a result of Owner's default. This waiver only restricts Residents ability to serve as a representative party or participate in a class action suit or claim against Owner or Owner's managing agents.**

(Doc. No. 590-2 at 56, 97, 142 (emphasis in original)). In October 2021, Weaver rented an apartment without a class action waiver at a property owned and managed by Defendant Bell Partners, Inc., which used RealPage RMS for pricing. (Doc. No. 530 ¶ 51).

### 5. Selena Vincin

Vincin initially leased a unit in Plano, Texas, from non-party Creekside Village, in 2015. (Doc. No. 530 ¶ 59). In 2018, Defendant CONTI Texas Organization, Inc., d/b/a/ CONTI Capital ("CONTI") acquired Creekside Village, and Vincin continued to rent the same apartment, renewing her lease three times until she moved out in 2020. (Id.; see also Doc. No. 590-4). Throughout each of these three lease renewals, "you" referred to Vincin, and "us" and "owner" referred to Creekside Village. (Id. at 8, 17, 26). Each of Vincin's leases contained the following waiver:

> 43. **Class Action Waiver.** You agree that you will not participate in any class action claims against us or our representatives. You

6

must file any claim against us individually, and **you expressly waive your ability to bring, represent, join or otherwise maintain a class action, collective action or similar proceeding against us in any forum.**

YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU COULD BE A PARTY IN A CLASS ACTION LAWSUIT. **BY SIGNING THIS LEASE, YOU ACCEPT THIS WAIVER AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY.** THE PROVISIONS OF THIS PAR[AGRAPH] 43 SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE.

(Doc. Nos. 590-4 at 15, 24, 27 (emphasis in original)).

## DISCUSSION

Defendants argue that the class action waivers are "clear and straightforward," (Doc. No. 591 at 10), and enforcing each waiver yields the same result: dismissal of that Plaintiff's claims in their entirety. (Id. at 10). To Defendants, the class action waivers foreclose Plaintiffs' ability to bring or participate in a class action claim against any alleged coconspirator (whether they were a party or third party-beneficiary to the relevant lease(s) or not) for any portion of the alleged conspiracy. (See Doc. No. 641 at 2 ("By signing their leases, the [named] Plaintiffs left no factual dispute when they agreed not to file class actions, and no valid reason exists to allow them to evade this promise.")). That Watters, Kabisch, Cherry and Weaver each have other No Waiver Leases for some part of the class period is irrelevant, Defendants say, because they "are asserting claims for the entire putative class action period" and "[n]one have offered to drop claims against the Defendants with class waivers." (Doc. No. 641 at 10).

In reality, enforcing the class action waivers based on these Plaintiffs' leases is not so clear cut. Watters' lease did not incorporate the Class Action Addendum in his contract, and Weaver's lease contains an ambiguity that, at a minimum, prevents the Court from enforcing the class action waiver at this early stage of litigation. As for the three other Plaintiffs against whom Defendants

seek to enforce these waivers, two (Kabisch and Cherry) have other leases without any class action waiver, and the applicable state law forecloses Defendants' maximalist position. Only Vincin's lease renewal class action waivers bar her claims. The Court will address each in turn.

### 1. Watters' Unsigned Addendum Was Not Incorporated in His Lease.

Watters argues that the Class Action Addendum was not a part of his lease[1] with DRI/CA Nashville because he never signed it. (Doc. No. 618 at 11–12). Lincoln disputes this, asserting that Watters is bound to the terms of the Class Action Addendum regardless of whether he signed it because "he reviewed the entire lease, signed the [Construction Addendum], lived in the unit, and paid rent according to the lease's terms." (Doc. No. 641 at 4). The Court disagrees.

It is well established in Tennessee that "a written contract is not required to be signed to be binding on the parties." Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co., 160 S.W.3d 521, 524 (Tenn. 2005) (citation omitted). Rather, "[w]hat is critical is mutual assent to be bound." T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). In determining mutuality of assent, courts use an "objective standard" based on the manifestations of the parties; "[w]hen a party who has not signed a contract has nonetheless manifested consent by performing under it and making payments conforming to its terms, that party is estopped from denying that the parties had a meeting of the minds sufficient to bind them to the contract." Id. at 866.

Watters cannot seriously dispute that he assented to be bound to the lease. (See Doc. No. 530 ¶ 54 (alleging that he paid rent in accordance with the lease)). Indeed, Watters' status as a plaintiff relies on it. Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) ("Injury in fact is a

---

[1] Watters' lease is governed by Tennessee law. (Doc. No. 591 at 7 n.5 (explaining that Watters' and Kabisch's leases are governed by Tennessee law because they executed contracts for residential units in Tennessee and contain no choice of law provision); Doc. No. 618 at 8 (also applying Tennessee law)).

constitutional requirement for standing."). Accordingly, the unsigned lease is enforceable against Watters under Tennessee law. But whether the class action waiver may be enforced against Watters turns on whether the unsigned Class Action Addendum was incorporated into the lease. Basic contract principles say no.

In Tennessee, a cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties. Allmand v. Pavletic, 292 S.W.3d 618, 630 (Tenn. 2009). The Court "initially determine[s] the parties' intent by examining the plain and ordinary meaning of the written words that are contained within the four corners of the contract." Dick Broadcasting Co., Inc. of Tenn. v. Ock Ridge RM, Inc., 395 S.W.3d 653, 659 (Tenn. 2013). The literal meaning of the contract language controls if the language is clear and unambiguous (i.e., it is not susceptible to more than one reasonable interpretation). Id.

The Court finds the relevant language of the lease to be clear and unambiguous. The lease contains a clause ("Clause 52") that dictates that the "lease is the entire agreement between [Watters] and [DRI/CA Nashville, LLC]" and "[a]ny addenda or amendment [Watters] sign[s] as part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract." (Doc. No. 590-1 at 13). Based on this language, only signed addenda are incorporated into the lease. Lincoln does not offer—nor can the Court conjure up—a second reasonable interpretation.

Instead, Lincoln argues that Watters incorporated every addendum by signing only the last one presented to him when he viewed the contract electronically—the Construction Addendum. (Doc. No. 641 at 4). Lincoln relies on nothing within the four corners of the lease that supports its interpretation. (Id.). Yes, Watters signed the Construction Addendum, but it is narrow, addressing the parties' rights related to "existing, on-going, or future construction on the property [which]

9

may affect [Watters'] use, view from, and enjoyment of such property." (Doc. No. 590-1 at 48). It does not incorporate any other unsigned Addendum. (Id.). Moreover, Lincoln's proposed interpretation contradicts the clear and unambiguous language of Clause 52. Watters did not sign the Class Action Addendum, so, unlike the signed Construction Addendum, it must be excluded from the lease. Accordingly, the waiver in the Class Action Addendum cannot be enforced against Watters.

### 2. The Scope of Weaver's Class Action Waiver is Limited to Default by Camden.

Camden relies on the following three sentences in each of Weaver's leases[2] in the paragraph titled "Default by Owner" to support its motion:

> **To the extent allowed by applicable law, Resident waives any ability or right to serve as a representative party for others similarly situated or participate in a class action suit or claim against the Owner or the Owner's managing agents. Resident acknowledges that this waiver does not, in any way, affect Resident's right to pursue any rights or remedies Resident may have against Owner as a result of Owner's default. This waiver only restricts Residents ability to serve as a representative party or participate in a class action suit or claim against Owner or Owner's managing agents.**

---

[2] Weaver's leases are governed by Colorado law. (See, e.g., Doc. No. 590-2 at 59).

(Doc. No. 590-2 at 56, 97, 142 (emphasis in original)).  According to Camden, because Colorado law requires courts enforce plain and unambiguous language in contracts as written, the three sentences' plain language should be read in isolation and applied broadly—to situations beyond default by the owner.  (See Doc. No. 641 at 6 ("While Plaintiffs argue that Camden's waiver does not cover these actions, the text of the waiver is not so limited. The waiver simply states that the resident waives any ability or right to serve as a representative party for others similarly situated or participate in a class action suit or claim against the Owner or the Owner's managing agents")). Weaver, on the other hand, argues that the three sentences should be limited based on their context and placement in a paragraph specific to instances of default by the owner.  (See Doc. No. 618 at 12 ("[T]he most logical interpretation of Weaver's Class Waiver is that . . . the parties did not intend for the waiver to apply to situations beyond Camden's default under the leases.")). According to Weaver, based on this, the waiver's meaning is ambiguous and, at a minimum, requires further context before it is enforced.  (Id. at 13).  The Court agrees with Weaver.

Under Colorado law, the primary goal of contract interpretation is to determine and give effect to the intent of the parties, and the interpretation of a written contract and the determination of whether a provision in the contract is ambiguous are questions of law.  McAuliffe v. Vail Corp., 69 F.4th 1130, 1144 (10th Cir. 2023) (quoting Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation, 9 P.3d 373, 376 (Colo. 2000)).  The intent of the parties is to be determined from the contract language itself. Id. (quoting Dorman v. Petrol Aspen, Inc., 914 P.2d 909, 912 (Colo. 1996)).  When a document is unambiguous, it cannot be varied by extrinsic evidence.  Id. (quoting Dorman, 917 P.2d at 911).   Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation.   Ad Two, Inc., 9 P.3d at 376.  "In ascertaining whether certain provisions of an agreement are ambiguous, the instrument's language

must be examined and construed in harmony with the plain and generally accepted meaning of the words employed." Id. "When an ambiguity is found to exist and cannot be resolved by reference to other contractual provisions, extrinsic evidence must be considered by the trial court." Pepcol Mfg. Co. v. Denver Union Corp., 687 P.2d 1310, 1314 (Colo. 1984).

In Allstate Insurance Co. v. Hauizar, the Supreme Court of Colorado specifically forbade "viewing clauses or phrases in isolation." 52 P.3d 816, 819 (Colo. 2002). There, the court applied "well-settled principles of contractual interpretation" to an insurance contract that was divided into a number of parts and determined that a provision contained within a given part should apply only to that part unless context or specific language indicates otherwise. Id. Ultimately, the court held that the provision at issue was unambiguously limited to its specific part and did not apply to the entire contract. Id. at 20.

Camden cautions the Court to not rely on Allstate because the leases at issue here were not divided into multiple parts and "[t]he class waiver is found within the only provision of the lease addressing the tenant's rights in the event of a default by the owner." (Doc. No. 641 at 7 n.13). Though Camden is correct that the contract contemplated in Allstate is more complex than Weaver's leases, it ignores that the Supreme Court of Colorado merely applied its state's universal rules for interpreting contracts when it interpreted the provision in context rather than in isolation. Allstate, 52 P.3d at 819. Here, the Court must do the same.

The class action waiver Camden seeks to enforce against Weaver is contained in a provision titled "Default by Owner." (Doc. No. 590-2 at 56, 97, 142). The sentences in that provision that precede the class action waiver all concern the owner's duties to repair and maintain

12

the apartment and the scope of Weaver's available legal recourse if the owner fails to adequately do so.  (Id.).  They read:

> Owner agrees to abide by applicable law regarding repairs and performance under this Lease.  ALL REQUESTS FOR REPAIRS MUST BE IN WRITING.  Unless exercising a right specifically granted by applicable law, Resident shall not be entitled to any abatement of Rent for any inconvenience or annoyance in connection with Owner's repairs or maintenance and may not withhold Rent under any circumstances, regardless of any alleged failure by Owner to repair or maintain, unless otherwise provided by applicable law.

(Id.).  Under Colorado law, the class action waiver contained in that provision must be read in that context.  Allstate, 52 P.3d at 819.  At a minimum, Weaver's suggestion that the class action waiver is a limited to default by the owner—and does not cover antitrust claims like those before the Court—is a second reasonable interpretation, Ad Two, Inc., 9 P.3d at 376, and the waiver cannot be enforced against Weaver without the benefit of discovery to clarify this ambiguity.

### 3. The Scope of Kabisch and Cherry's Identical Waivers is Limited to the Their Respective Leasing Periods.

Although Kabisch's and Cherry's identical class action waivers are governed by different state laws, the Court must apply the same principles in interpreting each.  As the Court has already explained, Tennessee law—which governs Kabisch's lease (Doc. No. 591 at 7 n.5; Doc. No. 618 at 8)—instructs courts to "ascertain and give effect to the intent of the parties," Allmand, 292 S.W.3d at 630, and "initially determine the parties' intent by examining the plain and ordinary meaning of the written words that are contained within the four corners of the contract."  Dick Broadcasting Co., Inc. of Tenn., 395 S.W.3d at 659.  Washington law—which governs Cherry's lease, Baffin Land Corp. v. Monticello Motor Inn, Inc., 70 Wash. 2d 893, 899, 901 (Wash. 1967)— likewise teaches that courts should "attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on unexpressed subjective intent of the

13

parties." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wash. 2d 493, 504 (Wash. 2005). Accordingly, courts applying Washington law must "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Id. at 505.

Neither Kabisch, nor Cherry, nor Greystar claims that Kabisch and Cherry's leases or identical class action waivers are ambiguous. (See Doc. No. 618 at 11–14 (arguing only that Watters', Weavers', and Vincin's leases contain ambiguities); see also Doc. No. 591 at 17 (arguing each class action waiver is plain and unambiguous)). The Court agrees. By signing their leases, Kabisch and Cherry each waived their "ability to participate either as a class representative or member of any class action against [the owner] or [the owner] agents." (Doc. No. 590-3 at 38, 169). Based on this language, these provisions bar Kabisch from participating in class action litigation against Gulch, LLC and its agents and bar Cherry from participating in class action litigation against Madison Summit, LLC and its agents. Although Gulch, LLC and Madison Summit, LLC are not parties to the case and the leases do not define who qualifies as an agent, Plaintiffs plead that Greystar managed both Gulch's and Madison Summit's properties. (Doc. No. 530 ¶¶ 57–58). Accordingly—and as Plaintiffs concede—the waiver provisions apply to Greystar as Gulch's and Madison Summit's agent. (See Doc. No. 618 at 6–7 ("Here, the waiver provisions in these agreements are unambiguous, and apply only to the owner of each property and its agents. The only agents named as Defendants are Lincoln, Greystar, and CONTI")).

Still, the scope of Kabisch and Cherry's identical class action waivers are hotly contested, with the parties taking different positions on two issues: (1) against whom the waivers bar class action claims; and (2) the period of time the waivers cover. Defendants argue that the waivers bar Kabisch and Cherry from bringing class action claims against any party to their leases and any

14

would-be codefendants arising at any time in perpetuity. (Doc. No. 591 at 10–14; Doc. No. 641 at 10). Kabisch and Cherry argue for a narrower interpretation: that the waivers—to the extent they are enforceable—only bar class action claims against the owners and agents based on conduct occurring while the leases were in effect. (Doc. No. 618 at 4–5, 8–10). The Court turns to these issues.

*First*, despite the waivers' plain language, Defendants insist they go further, arguing that equitable estoppel allows all Defendants to enforce the class action waiver because "courts have applied the doctrine of equitable estoppel in the antitrust context to allow non-signatory defendants to enforce class waivers" and the "flexible approach" of relevant state law permits Defendants to apply the doctrine in like situations. (Doc. No. 641 at 10–11). Kabisch and Cherry argue that Tennessee and Washington law are far less permissive than Defendants claim. (Doc. No. 618 at 8–10).

On this point, the Court agrees with Defendants. The Tennessee Court of Appeals has acknowledged—and a court in this district has applied—equitable estoppel against a signatory when a signatory raises allegations of concerted misconduct by both the nonsignatory and one or more signatories in the contract. See Green v. Mission Health Communities, LLC, 2020 WL 6702866, at *7–9 (M.D. Tenn. Nov. 13, 2020) (citing Blue Water Bay at Center Hill, LLC, No. M2016-02382-COA-R3-CV, 2017 WL 5665410, at *9 (Tenn. Ct. App. Nov. 27, 2017)). Washington courts have likewise applied equitable estoppel to similar situations "when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are based on the same facts and inherently inseparable from arbitrable claims against signatory defendants." David Terry Investments, LLC-PRC v. Headwaters Development Group LLC, 463 P.3d 117, 124 (Wash. Ct. App. 2020) (internal quotation markets and citation

omitted).  Both circumstances are met here, as the alleged misconduct is a price-fixing conspiracy and Plaintiffs' claims precipitate directly from their leasing agreements.  Thus, all Defendants may enforce Kabisch's and Cherry's waivers.

*Second*, Defendants insist that the waivers apply to class action claims that might arise at any time until the end of creation.  Not so.  Both Kabisch and Cherry entered leases without class action waivers with other Defendants during the class period and may pursue their class action claims against all Defendants—including Greystar—for the period covered by those other leases. Facing a near-identical issue, the Western District of Tennessee determined that, pursuant to Tennessee law, in the absence of a survival clause, a class action waiver is only applicable after the termination of a contract when "the dispute turns on facts and occurrences that arose before the expiration of the contract."  Stevens-Bratton v. TruGreen, Inc., No. 2:15-cv-2472, 2020 WL 4275262, at *5 (W.D. Tenn. July 24, 2020).  This holds true even when the class action clause is broadly written.   In Stevens-Bratton, the defendants argued that "the Class Action Waiver provision is not limited by time, subject matter, or forum" and therefore "a plain and sensible reading [of the waiver] . . . must apply to any claim, dispute or controversy."  Id. (internal quotation marks and citation omitted).  However, based on the lack of a survival clause, the court reasoned that the plain language of the contract at issue demonstrated the parties did not intend for its provisions to survive cancellation.  Id.  Thus, enforcing the class action waiver so broadly would be akin to "read[ing] into the Service Agreement a survival clause that does not exist."  Id.  The principles of contract interpretation used in Stevens-Bratton apply equally under Washington law. See e.g., Hearst Commc'ns, Inc., 154 Wash. 2d at 503 ("Washington continues to follow the objective manifestation theory of contracts.").  Faced with equally broad class action waivers and no survival clauses, (see generally Doc. No. 590-3), the Court will not read into the leases survival

16

clauses that would extend those waivers to all claims in perpetuity.[3]  Accordingly, the Court will enforce Kabisch's and Cherry's class action waivers only as they relate to their respective leasing periods.

### 4.  Vincin's Lease Renewal Class Action Waivers are Enforceable.

Much of the Court's analysis on Kabisch and Cherry's leases applies equally to Vincin's lease renewals.  However, unlike Kabisch and Cherry, Vincin never entered into a lease with a Defendant without a class action waiver.  Ultimately, this difference in circumstance dictates a different result.

 Vincin's lease renewals are governed by Texas law, (see, e.g., Doc. No. 590-4 at 11), which instructs that "objective manifestations of intent control" and "presume[s] parties intend what the [plain, ordinary, and generally accepted meaning of the] words of their contract say." URI, Inc. v. Kelberg Cnty., 543 S.W.3d 755, 763–64 (Tex. 2018).  "Only when the contract is ambiguous may a court [applying Texas law] consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument."  Id. at 765.

The plain language of the waivers in Vincin's lease renewals is unambiguous; each provision reads:

> 43. **Class Action Waiver.**  You agree that you will not participate in any class action claims against us or our representatives.  You must file any claim against us individually, and **you expressly waive your ability to bring, represent, join or otherwise**

---

[3] Because Colorado also follows these same principles, see Ad Two, 9 P.3d at 376 ("Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language"), this applies equally to Weaver's circumstance if the Court later determines that his waiver applies to situations beyond those involving default by the owner.

> **maintain a class action, collective action or similar proceeding against us in any forum.**
>
> YOU UNDERSTAND THAT, WITHOUT THIS WAIVER, YOU COULD BE A PARTY IN A CLASS ACTION LAWSUIT. **BY SIGNING THIS LEASE, YOU ACCEPT THIS WAIVER AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY.** THE PROVISIONS OF THIS PAR[AGRAPH] 43 SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS LEASE.

(Doc. Nos. 590-4 at 15, 24, 27 (emphasis in original)). This language leaves no room for doubt. By entering into her lease renewals, Vincin "agree[d] that [she] will not participate in any class action claims against [Creekside Village] or [Creekside Village's] representatives." (Id.). Although Vincin attempts to create an ambiguity by focusing on the undefined term "representative," (Doc. No. 618 at 14), elsewhere Vincin concedes that CONTI is a party to Vincin's lease renewals. (Doc. No. 618 at 5 ("Only Lincoln, Greystar, and CONTI are parties to any of the Waiver Leases"). Thus, the waiver clearly bars Vincin from participating in class action claims against either Creekside Village or CONTI.

Defendants' equitable estoppel argument also applies equally to Vincin's lease renewals. Pursuant to Texas law, "equitable estoppel is warranted when the signatory to the contract . . . raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories" and/or when "the nature of the underlying claims requires the signatory to rely on the terms of the written agreement containing the . . . provision in asserting its claims against the nonsignatory." Tex. Etners., Inc. v. Arnold Oil Co., 59 S.W.3d 244, 249 (Tex. App. 2001); see also Naranjo v. Nick's Management, Inc., 652 F. Supp. 3d 737, 753–54 (N.D. Tex. 2023) ("Equitable estoppel prevents signatories from 'having their cake and eating it too'; a signatory cannot simultaneously enjoy the benefits of their contract and avoid its burdens simply because they sue a nonsignatory."). As recently as this year, a federal court in

18

Texas applied Texas's doctrine of equitable estoppel where both of these independent bases were met. <u>Naranjo</u>, 652 F. Supp. 3d at 754. Because both bases are also met here—as the alleged misconduct is a price-fixing conspiracy and Vincin's claims precipitate directly from her lease renewals—all Defendants may enforce the provision against Vincin.

As previously stated, unlike Kabisch or Cherry, Vincin did not enter into any leases or lease renewals not containing a class action waiver with another Defendant. (<u>See</u> Doc. No. 618 at 4–5 ("Weavers, Watters, Kabisch, and Cherry each rented from two different Defendants during the Class Period.")). The Multifamily Complaint alleges that she rented the same Creekside Village apartment from 2015 to 2020, (Doc. No. 530 ¶ 59), and she concedes that CONTI only acquired the Creekside Village in 2018. (Doc. No. 618 at 3). Without a lease agreement with a second Defendant, Vincin's only ties to this litigation are the lease renewals that forbid her participation in class action claims. For this reason, enforcing those provisions results in the dismissal of her class action claims.

To save her case, Vincin asserts that her waiver is procedurally and substantively unconscionable.[4] Vincin argues that the waiver is procedurally unconscionable because "[t]he lease was a standardized TAA form, which is used by the overwhelming majority lessors, and the waiver is directly in the leases themselves—literally requiring the prospective tenant to accept it in order to rent an apartment unit." (Doc. No. 618 at 22). Therefore, says Vincin, "there is a high likelihood that discovery will further reveal that [she] had no power to reject the class action waiver

---

[4] Watters, Weaver, Kabisch and Cherry also argue that the waivers Defendants seek to enforce against them are all unconscionable. However, for reasons already stated, those waivers will not be enforced to the extent Defendants' motion requests at this stage of litigation, and those Defendants named only in Watters', Weaver's, Kabisch's and/or Cherry's cases will continue to class discovery. Accordingly, the Court need not rule on the often fact-intensive issue, <u>see e.g.</u>, <u>All Commercial Floors, Inc. v. Commercial Floor Products, LLC</u>, No. 3:17-cv-01252, 2019 WL 330880, at *5–6 (M.D. Tenn. Jan. 25, 2019), without the benefit of that discovery.

19

if she wanted to lease an apartment anywhere in Texas." Id. These circumstances no doubt turn the table sharply against Vincin. However, they are not recognized as "unconscionable" under Texas law. Earlier this year, a federal court in Texas ruled that, under Texas law, class action waivers are not procedurally unconscionable even when that waiver is included as part of an adhesion contract. Rathmann v. Ford Motor Co., No. 6:21-cv-00610, 2023 WL 6150270, at *4–5 (W.D. Tex. Aug. 25, 2023). Though Vincin briefly argues that its terms are substantively unconscionable, that same court explained that class litigation "hardly represent[s] a public policy interest that is so strong that parties may not contractually waive it." Id. at *3. At bottom, Vincin's arguments are unmoored from Texas law on the issue. Her class action waivers must be enforced.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE