# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: REALPAGE, INC., RENTAL | ) | NO. 3:23-md-03071 |
| SOFTWARE ANTITRUST | ) | MDL No. 3071 |
| LITIGATION (NO. II) | ) | |
| | ) | **THIS DOCUMENT RELATES TO:** |
| | ) | |
| | | **ALL CASES** |

## <u>MEMORANDUM OPINION</u>

All Defendants named in the Student Plaintiffs' First Amended Consolidated Class Action Complaint ("Student Complaint") (Doc. No. 527) filed a Motion to Dismiss the Student Complaint (Doc. No. 587) and Memorandum of Law. (Doc. No. 588). The Student Plaintiffs responded (Doc. No. 617), and the Student Defendants filed a Reply. (Doc. No. 643).

All Defendants named in the Multifamily Plaintiffs' Second Amended Consolidated Class Action Complaint ("Multifamily Complaint") (Doc. No. 530) filed a Motion to Dismiss the Multifamily Complaint (Doc. No. 592) and Memorandum of Law. (Doc. No. 593). The Multifamily Plaintiffs responded (Doc. No. 623), and the Multifamily Defendants filed a Reply. (Doc. No. 639).

On November 15, 2023, the United States of America filed a Statement of Interest (Doc. No. 627) and a Memorandum of Law (Doc. No. 628) arguing that the Complaints adequately allege violations of Section 1 of the Sherman Act, and Defendants filed a Response (Doc. No. 644).

1

The motions are ripe for review. The Court addresses both motions together in this Memorandum Opinion.[1] For the reasons that follow, the Court will deny the motion to dismiss the Multifamily Complaint and grant the motion to dismiss the Student Complaint.

## BACKGROUND

The following allegations are taken from the Multifamily Plaintiffs' Second Amended Complaint ("Multifamily Complaint") (Doc. No. 530) and the Student Plaintiffs' First Amended Complaint ("Student Complaint") (Doc. No. 527) and are accepted as true to resolve the pending motions.

The allegations suggest that student and multifamily rental housing markets throughout the United States have been tainted by an illegal price-fixing conspiracy. The conspiracy is facilitated by revenue management software that takes property owners' and managers' sensitive pricing and supply data, applies its algorithm across this data, and then spits out price recommendations for each rental unit. By co-mingling their sensitive pricing and supply data within this revenue management software, horizontal competitors conspire to fix prices in their respective rental housing markets.

RealPage, Inc. ("RealPage") is a software company that developed an "integrated technology platform that provides software solutions for the multifamily [and student] housing markets."[2] (Doc. No. 530 ¶ 2; see also Doc. No. 527 ¶ 5). Only one of these types of software

---

[1] Certain sections of this Opinion relate solely to the Multifamily Complaint or the Student Complaint, as indicated by the section headers. Within those sections, "Plaintiffs" and "Defendants" reference the parties specific to the Complaint named in the section header. In all other sections of the Opinion, references to "Plaintiffs" and "Defendants" concern all parties named in the Multifamily and Student Complaints.

[2] Student housing does not refer to dormitories, fraternities or sororities, or other forms of housing provided by a university or student organizations, nor does it refer to the remainder of housing options near college campus. (Doc. No. 527 ¶ 2). Rather, student housing is "purpose-built housing" designed specifically for students by companies unaffiliated with colleges and

solutions is relevant to this case—RealPage's revenue management software. RealPage introduced its first revenue management software, YieldStar, after acquiring it from Camden Property Trust in 2002. (Doc. No. 530 ¶ 209). In 2009, RealPage launched YieldStar Student Housing ("YieldStar Student"), which by 2013 allowed users to "input community data" to assist in "project[ing] future pricing." (Doc. No. 527 ¶ 40). RealPage expanded the reach of its revenue management services by acquiring Lease Rent Options ("LRO") and Student Lease Rent Options[3] ("LRO Student") from Rainmaker Group in 2017. (Doc. No. 530 ¶ 26; Doc. No. 527 ¶¶ 14, 46). In 2020, RealPage launched AI Revenue Management ("AIRM"), a "combination of its legacy revenue management platforms [YieldStar and LRO] and a super-charged price optimization and revenue management tool." (Doc. No. 530 ¶ 221; Doc. No. 527 ¶ 48). Today, RealPage offers a full suite of revenue management services, which also includes RealPage Revenue Management ("RPRM") and RealPage Student Revenue Management ("Student RPRM"). (Doc. No. 530 ¶ 2; Doc. No. 527 ¶ 4). Throughout this Opinion, the Court refers to these software solutions collectively as the "Revenue Management Solutions" or "RMS." In part because of its successful and lucrative RMS, RealPage, formerly a public company, was purchased by private equity firm Thoma Bravo in December 2020 for $10.2 billion. (Doc. No. 530 ¶¶ 61, 63-64).

RealPage solicits clients to use its Revenue Management Solutions by promising that they will "outperform the market" with "software that . . . use[s] a database of rental prices in [each

---

universities and is recognized as a separate market by property managers within the real estate industry. (Id.). Other factors that distinguish student housing from other housing markets—including the multifamily housing market—are the students' need to live near their schools' campuses, the limited time window in which students must make rental decisions because the leasing cycle is tied to the beginning and end of the academic year, and that student housing leases often rent on a per bed rather than a square foot basis. (Id.).

[3] LRO Student took into account unique aspects of the student housing market in projecting prices, including the fact that individual units are often leased by beds and that tenants generally do not renew their leases when they graduate. (Doc. No. 527 ¶ 45).

3

client's] area (including competitors' prices) and provide[s] the optimal price to charge prospective tenants, with both short- and long-term goals of increasing revenues by raising rents." (Doc. No. 530 ¶ 4). To achieve this promised revenue outperformance, RealPage's clients must allow RealPage to use their commercially sensitive pricing and supply data in its RMS algorithms, both to set each client's own rent prices and to help set rent prices of its horizontal competitors. (Doc. No. 530 ¶ 5; Doc. No. 527 ¶ 6). These clients must also be willing to "outsource [their] daily pricing and ongoing revenue oversight" to RealPage by accepting RealPage's price recommendations upwards of 80-90% of the time and allowing RealPage to set prices for their properties "as though [RealPage] own[s] them [itself]." (Doc. No. 530 ¶¶ 7, 15).[4] RealPage's RMS clients either accept oversight of their pricing activities by a RealPage pricing advisor or allow RealPage to train their internal revenue managers who perform similar oversight. (Doc. No. 530 ¶ 17; Doc. No. 527 ¶ 54).

RealPage's RMS invitation to "outperform the market," primarily by increasing rent prices, has been accepted by many clients. These clients include owners of residential properties, companies that serve as both owners and operators of residential properties, and property management companies, including large property managers and lessors of student housing.[5] (Doc. No. 530 ¶ 3; Doc. No. 527 ¶ 3). These companies are often horizontal competitors. (Doc. No. 530 ¶ 6; Doc. No. 527 ¶ 230). As of December 2020, RealPage "had over 31,700 clients, including each of the 10 largest multifamily property management companies in the United States." (Doc. No. 527 ¶ 21; see also Doc. No. 530 ¶ 61). By the end of 2022, RealPage's RMS was being used

---

[4] The Student Complaint alleges that RealPage clients accept its RMS price recommendations as often as 98 to 99% of the time. (Doc. No. 527 ¶¶ 56, 70, 86).
[5] The Court refers to Defendants who are RealPage clients collectively as the "Lessors" or the "RMS Client Defendants" throughout this Opinion.

4

to price over four million multifamily housing units across the United States. (Doc. No. 530 ¶ 224). As for student housing rental units, according to a press release in 2019, YieldStar Student alone served "more than 50 clients" across the country, (Doc. No. 527 ¶ 47), and Lessors now manage hundreds of thousands of student beds across the country. (Id. ¶¶ 17-32).

Plaintiffs allege that RealPage and RMS Client Defendants have formed an illegal price-fixing cartel by jointly using RealPage's RMS software. (See Doc. No. 530 ¶ 6; Doc. No. 527 ¶¶ 118, 156). As the cartel leader or the "hub" of the conspiracy, RealPage serves as an intermediary between horizontal competitors in the multifamily and student housing markets. (Doc. No. 530 ¶¶ 230, 276, 311). It takes its clients commercially sensitive pricing and supply data, runs its RMS algorithm against that collective data pool, and then spits out rental pricing recommendations for each of its clients' properties. (Doc. No. 530 ¶ 4). RMS Client Defendants agree to set prices based on a pool of their horizontal competitors' proprietary data and reasonably believe that their competitors are using the same data and methods to price their properties. (Doc. No. 530 ¶¶ 6-7).

Multifamily Plaintiffs allege that this illegal cartel was formed in the multifamily housing rental market by January 2016. (Doc. No. 530 ¶¶ 1, 694, 702). By that point, RealPage's YieldStar software had been on the market for fourteen years, operating as a rent advisory service. (Doc. No. 530 ¶ 212). In early 2016, RealPage transitioned YieldStar to become a "rent-setting software." (Id. ¶ 212). When the illegal cartel was formed, YieldStar was being used to price approximately 1.5 million multifamily housing units across the United States. (Id. ¶ 215). With its 2017 acquisition of LRO, RealPage doubled the number of units that its RMS was responsible for pricing to three million. (Id. ¶¶ 214-15). Beginning in early 2018, RealPage integrated its YieldStar and newly-acquired LRO platforms into a single unified platform and by "no later than 2020, . . . all RealPage RMS were combined into a single unified database." (Doc. No. 530 ¶¶

5

221-222; see also Doc. No. 527 ¶ 63 ("RealPage offers a product that creates one unified platform . . .")).

Student Plaintiffs allege that the conspiracy to fix prices in the student housing rental market began in early 2010, soon after the launch of YieldStar Student. (Doc. No. 527 ¶ 40). According to Student Plaintiffs, YieldStar Student "quickly obtained buy-in from a critical mass of customers in the student housing market." (Id.). By 2013, RealPage had collected a wealth of so-called "community data" from its users to produce pricing data for its users. YieldStar's then-vice president of market development announced that "Yieldstar Student Housing had improved user revenues by 3 to 7 percent relative to the market," that RealPage "had a proven track record on a sustained basis for the past four years with the same partners and the same assets," and that RealPage had continued to sign up "partners" to its software, which would make "its user-supplied market data . . . even more complete." (Id. ¶ 41). In a 2019 press release, RealPage announced that YieldStar Student served "more than 50 clients." (Id. ¶ 47). Similar to the allegations in the Multifamily Complaint, Student Plaintiffs allege that RealPage expanded with the later inclusions of Student LRO and AIRM. (Id. ¶¶ 46-50).

RMS Client Defendants began using RealPage at different times and have used various iterations of RealPage's YieldStar, LRO, and AIRM RMS software. (See Doc. No. 530 ¶¶ 67-193). Each RMS Client Defendant separately contracts with RealPage, paying RealPage monthly fees that are as much as one to two dollars per unit, in addition to other periodic fees such as pricing advisor fees and corporate training fees. (Doc. No. 530 ¶ 14). RMS Client Defendants also pay one-time license fees, (id.), and may be required to "renew their software licenses annually." (Id. ¶ 276).

6

In addition to paying RealPage's fees, RMS Client Defendants also provide RealPage their independent commercially sensitive pricing and supply data and allow RealPage to use this data to set prices for not only their own properties, but also the properties of their horizontal competitors who use RMS. (Doc. No. 530 ¶¶ 5, 13; Doc. No. 527 ¶ 9). RealPage then applies its RMS algorithm to this data pool of client information to determine the daily optimal rent prices for each of RealPage's clients, which is then available for each RealPage client to apply to multifamily and student apartment units in each of the markets where those clients are located. (Doc. No. 530 ¶ 4; Doc. No. 527 ¶ 9). By using RMS, RMS Client Defendants are able to "price their units according to their collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive environment." (Doc. No. 530 ¶ 11; Doc. No. 527 ¶ 9). They do this by collectively agreeing to price their rental units in accordance with RealPage's RMS pricing recommendations. (Doc. No. 530 ¶¶ 11, 15; Doc. No. 527 ¶ 6). RMS Client Defendants with multifamily properties also artificially control the supply of rental units by "allow[ing] a larger share of their units to remain vacant," (Doc. No. 530 ¶ 31), and staggering lease renewals to "minimize naturally occurring periods of oversupply." (Id. ¶ 36).

In order for RealPage to ensure it delivers on its promise to "outperform the market," (Doc. No. 530 ¶ 4), RealPage must ensure that its clients actually adopt the prices it recommends. After all, if RealPage recommends increased rents to ten clients in a particular market and nine of those clients adopt the increases but one chooses to undercut the others, the one client with lower rent prices may attract more renters while the others suffer from increased vacancies. (Doc. No. 530 ¶¶ 31, 202-03, 303).

To avoid this outcome, RealPage has created a robust multi-layered monitoring system. RealPage's clients are assigned pricing advisors or revenue managers, employed by RealPage,

7

who closely monitor clients' conformance with RealPage's pricing recommendations, including through reviewing client pricing recommendations daily and issuing weekly reports. (Doc. No. 530 ¶¶ 17, 255, 257-62; Doc. No. 527 ¶¶ 7, 54, 56, 89). Some clients use their own in-house pricing advisors, but these individuals are trained by RealPage.[6] (Doc. No. 530 ¶ 17; Doc. No. 527 ¶ 54). When a client deviates from a pricing recommendation, pricing advisors challenge that deviation and "impart the notion that a client's explanation [for a deviation] has to provide acceptable reasons pertaining to property management operations to override a pricing recommendation." (Doc. No. 530 ¶ 260). "To ensure clients remain[] in the 80 to 85% acceptance rate target that RealPage s[eeks], . . . Pricing Advisors often spen[d] considerable time . . . educat[ing] clients on the pricing methodology and associated benefits of accepting all, or almost all RealPage pricing recommendations, despite increasing vacancy rates." (Doc. No. 530 ¶ 262 (internal quotations omitted)). One former RealPage Pricing Advisor "reported that RealPage recommended RMS clients accept RealPage's pricing recommendations 100% of the time, other than in limited circumstances." (Id. (internal quotations omitted)).

Pricing advisors who oversee RealPage's student housing clients monitor and report on rents, occupancy, and revenue trends on a weekly or daily basis, and review their findings regularly with Lessors' onsite employees and regional management. (Doc. No. 527 ¶ 7). Certain Lessors in the student housing market accepted RealPage's price recommendations "98 to 99% of the time." (Id. ¶ 56). In at least one instance, RealPage pricing advisors met with Student Defendant Cardinal Group Holdings, LLC's employees weekly, reviewed the recommended rates that RealPage gave them, and "lock[ed] in the rents for the week." (Id. ¶¶ 8; 59). Cardinal Group

---

[6] Certain Lessors used a RealPage-built private website to train their managers on how to use RealPage RMS. (Doc. No. 527 ¶ 57).

8

executives, including its head of asset management and its director of revenue, participated on these calls. (Id. ¶ 59). Likewise, CA Student would have phone calls on a weekly basis during the pre-leasing season to discuss "revenue growth goals for the building, the rent amounts, the number of pre-leased units. . . . [and] actions of competitor buildings, including their preleasing status, promotions, and rent amounts." (Id. ¶ 60). Another Lessor, Campus Advantage, employed a RealPage tool that automatically accepted RealPage's pricing recommendations and discouraged onsite workers from overriding those recommendations by requiring them to both manually override those recommended prices and justify, in writing and with objective facts, their reasons for deviating from the recommended prices. (Doc. No. 527 ¶ 6).

RealPage also conducts quarterly Performance to Market meetings with some client executives, "designed to identify how compliant the client was with RealPage's pricing recommendations during the prior quarter, and quantify any purported revenue loss that RealPage attributed to the client's deviations from its pricing recommendations." (Doc. No. 530 ¶¶ 19, 237-38). In late 2019, RealPage improved upon its price-monitoring arsenal by "tracking not only a client's acceptance rate, but also the identity of the personnel within a client's business that issued a [price deviation] request." (Doc. No. 530 ¶ 269). When the obstinate employee is identified, RealPage aims to reign in that employee. (Doc. No. 530 ¶ 269; Doc. No. 527 ¶¶ 7, 89). "[T]o diverge from RealPage's RMS pricing requires approval from a RealPage Pricing Advisor or an internal RealPage-trained revenue manager, and often approval from senior management within the Owner-Operator and/or Managing Defendant organization." (Doc. No. 530 ¶ 18).

RMS Client Defendants acknowledge their strict alignment with the RMS pricing recommendations. Camden Property Trust "confirmed that once RealPage is engaged, there is not much to do beyond checking the software to ensure that it is continuing to push prices higher."

(Doc. No. 530 ¶ 7).  An Associate Vice President of ECI Group, Inc. explained the benefit of this alignment in 2019:

> [T]he design and functionality of [RealPage's] LRO offers detailed insight into how actual competitors impact pricing strategies . . . With LRO we rarely make any overrides to the [pricing] recommendations . . . We are all technically competitors, [but] LRO helps us to work together . . . to make us all more successful in our pricing . . . LRO is designed to work with a community in pricing strategies, not work separately.

(Doc. No. 530 ¶ 9).

This collective behavior, driven by RealPage's pricing recommendations and monitoring procedures, has, according to Multifamily Plaintiffs, resulted in "parallel pricing that cannot be explained by typical economic factors" among RMS Client Defendants.  (Id. ¶ 22).  Between March 2015 and March 2023, "increased usage of RealPage's RMS corresponded with increasing [multifamily] rents over th[e] same period."  (Doc. No. 530 ¶ 21).  As for student housing, a regression analysis conducted on student housing in four cities of properties using RealPage RMS "estimated an average overcharge of 10.9% on properties that were priced using YieldStar Student . . ." for one month.  (Doc. No. 527 ¶ 141).  This scheme insures that RMS Client Defendants achieve RealPage's touted aim to "outperform" the normal market, primarily through raising rent prices.

## LEGAL STANDARD

The parties recognize, as they must, that to survive a motion to dismiss for failure to state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In reviewing a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016).  However, the Court will

"disregard bare legal conclusions and naked assertions" and "afford[] the presumption of truth only to genuine factual allegations." Dakota Girls, LLC v. Philadelphia Indem. Ins. Co., 17 F.4th 645, 648 (6th Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2007)) (internal quotations omitted). Nor can the Court "credit a threadbare recital of the elements of a cause of action ... supported by mere conclusory statements." Dakota Girls, 17 F.4th at 648 (citing Iqbal, 556 U.S. at 678)) (internal quotations omitted). The "factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Cabinets to Go, LLC v. Qingdao Haiyan Real Est. Grp. Co., 605 F. Supp. 3d 1051, 1057 (M.D. Tenn. 2022) (quoting Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010)), *reconsideration denied sub nom*. 2023 WL 5013055 (M.D. Tenn. Aug. 7, 2023). "Ultimately, only a complaint that states a plausible claim for relief survives a motion to dismiss." Dakota Girls, 17 F.4th at 648 (quoting Iqbal, 556 U.S. at 679)) (internal quotations omitted). To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of each claim. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

## ANALYSIS

Plaintiffs bring federal claims pursuant to Section 1 of the Sherman Act as well as state law antitrust claims against Defendants. (See Doc. No. 530 ¶¶ 701-57; Doc. No. 527 ¶¶ 218-35). Defendants have moved to dismiss all of the claims. (See Doc. No. 593 at 3; Doc. No. 587 at 1). The Court addresses each claim in turn.

## I.  Federal Claims Under Section 1 of the Sherman Act

To state a plausible claim under Section 1 of the Sherman Act, a plaintiff must allege three elements: (1) the existence of a contract, combination, or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce.  See Hobart-Mayfield, Inc. v. National Operating Committee on Standards for Athletic Equipment, 48 F.4th 656, 663 (6th Cir. 2022).  Private plaintiffs must also allege a fourth element, an antitrust injury.  See In re Cardizem CD Antitrust Litig., 332 F.3d 896, 909 (6th Cir. 2003).

Defendants challenge three of the four elements.  As to the first element, Defendants argue that Plaintiffs have not plausibly alleged any conspiracy between RMS Client Defendants.  (See Doc. No. 593 at 13-27; Doc. No. 588 at 11-23).  Under the second element, Defendants argue that whether the Court uses *per se* analysis or the Rule of Reason, Plaintiffs have not adequately alleged that Defendants' conduct unreasonably restrains trade.  (See Doc. No. 593 at 29-37; Doc. No. 588 at 23-31).  Finally, Defendants argue that Plaintiffs have not alleged any antitrust injury, and thus do not have antitrust standing.  (See Doc. No. 593 at 37-38; Doc. No. 588 at 31).  The Court first addresses the standard of review that applies and then addresses each of Defendants' arguments.

### A.  Legal Standard

At the motion to dismiss phase of a case, a Sherman Act Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement [to conspire] was made." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007).  In Twombly, the Supreme Court clarified that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  Id.

12

At summary judgment, after the benefit of discovery, the burden is higher. At that time, a plaintiff "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). In Erie County, Ohio v. Morton Salt, Inc., the Sixth Circuit explained the importance of differentiating between these two standards:

> [I]n order to state a Section One claim, a plaintiff need not allege a fact pattern that "tends to exclude the possibility" of lawful, independent conduct. The "tends to exclude" language traces its provenance to Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984), and Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986), which were both decisions dealing with summary judgment and the standard of proof required to submit an issue to the jury. In restating the same language, the Supreme Court in Twombly was mindful of those decisions' procedural context . . . and nowhere held that the same standard applies on a motion to dismiss. And there is no authority cited by either the parties or the district court for extending the same standard to the pleading stage.
>
> To the contrary, the only circuit court of appeals that to our knowledge has considered such an extension has rejected it, and so has the leading treatise in the field. . . . The rationale for rejecting such an extension is clear: If a plaintiff were required to allege facts excluding the possibility of lawful conduct, almost no private plaintiff's complaint could state a Section One claim. Rational people, after all, do not conspire in the open, and a plaintiff is very unlikely to have factual information that would exclude the possibility of non-conspiratorial explanations before discovery. Accordingly, the regular motion-to-dismiss standard should apply.

702 F.3d 860, 869 (6th Cir. 2012) (internal citations omitted).

In their motions to dismiss, Defendants ask the Court to employ a summary judgment standard at the motion to dismiss phase of the case. Quoting from the Sixth Circuit's opinion in Hobart-Mayfield, Inc. v. Nat'l Operating Comm. On Standard for Athletic Equipment and this Court's opinion in C.S. Sewell, M.D. P.C. v. Amerigroup Tennessee Inc., Multifamily Defendants argue that:

> Plaintiffs must allege parallel conduct and plus factors that plausibly "tend[] to exclude the possibility of independent conduct." Hobart-Mayfield, 48 F.4th at 664. Plaintiffs' allegations must "negate the likelihood of independent action and raise

13

an inference of coordination." C.S. Sewell, M.D. P.C. v. Amerigroup Tenn., Inc., 2018 WL 6591429, at *4 (M.D. Tenn. Dec. 14, 2018)[.]

(Doc. No. 593 at 13-14) (quotations and citations in original). Student Defendants rely on the same two cases to argue that Plaintiffs must "allege parallel conduct under circumstances tending to exclude the possibility of independent conduct." (Doc. No. 588 at 11-12).

Critically, however, both the Multifamily and Student Defendants leave out the discussion in those two opinions that makes clear the courts are using the motion to dismiss standard articulated in Twombly—that a complaint must allege sufficient facts to raise a plausible inference of unlawful agreement. In C.S. Sewell, this Court held that "Sewell has alleged sufficient circumstantial facts to plausibly raise an inference of an unlawful agreement." 2018 WL 6591429, at *4. Likewise, in Hobart-Mayfield, Inc., the Sixth Circuit held that "[b]ecause Mayfield has failed to 'plausibly suggest' that NOCSAE and Helmet manufacturers entered into an 'agreement to restrain trade in violation of the Sherman Act,' we reject its Count I claim." 48 F.4th at 665 (quoting In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009)). The Court rejects Defendants' arguments that the Multifamily and Student Complaints must "tend to exclude" or "negate the possibility" of independent conduct at this juncture in the case, prior to discovery.[7] See In re Dealer Management Systems Antitrust Litig., 313 F. Supp. 3d 931, 953 (N.D. Ill. 2018) (collecting cases stating that a showing of evidence that tends to exclude the possibility of independent conduct is not necessary at the pleading stage). Instead, the Court

---

[7] Even if the Court were to use the "negate the possibility" standard at this phase of the case, Defendants improperly expand the meaning of that standard. As the Seventh Circuit held in Toys R Us, Inc. v. Fed. Trade Comm'n, it would be "an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred. The test states only that there must be some evidence which, if believed, would support a finding of concerted behavior." 221 F.3d 928, 935 (7th Cir. 2000).

14

examines whether the allegations in the Multifamily and Student Complaints raise a "plausible inference" of an unlawful agreement to conspire.

## B. Conspiracy

The Sherman Act "proscribes only concerted action, not independent conduct." Cupp v. Alberto-Culver USA, Inc., 310 F. Supp. 2d 963, 972 (W.D. Tenn. 2004). Therefore, "a complaint alleging violations under § 1 of the Sherman Act cannot survive a motion to dismiss unless it avers facts that raise a reasonable expectation that discovery will reveal evidence of an illegal agreement" to conspire. In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 902 (6th Cir. 2009) (citing Twombly, 550 U.S. at 556). An agreement to conspire "can be found when the conspirators have a unity of purpose, common understanding, or a meeting of minds in an unlawful arrangement." Hyland v. HomeServices of America, Inc., 771 F.3d 310, 318 (6th Cir. 2014) (quoting Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)) (internal quotations omitted).

Agreements to conspire can be vertical or horizontal.[8] A vertical agreement is an agreement between "persons at different levels of the market structure, e.g., manufacturers and distributors." United States v. Topco Associates, Inc., 405 U.S. 596, 608 (1972). For example, an agreement between a fisherman, who catches and supplies trout, and a fish market, which sells the trout to consumers, is a vertical agreement. A horizontal agreement is "an agreement between

---

[8] Whether an agreement is vertical or horizontal matters for the second element of a Sherman Act claim—whether the agreement unreasonably restrains trade. As the Court discusses in more detail in the restraint of trade portion of this opinion, in limited circumstances involving horizontal agreements to conspire, a *per se* standard applies to the restraint of trade element. The *per se* standard presumes the agreement causes an unreasonable restraint of trade without requiring a plaintiff to make a showing of such. For conspiracies involving vertical agreements to conspire or horizontal agreements not obviously anticompetitive that the per se standard is applied, the Rule of Reason standard is used. That standard requires the plaintiff to allege, and eventually prove, anticompetitive effects of the conspiracy.

15

competitors at the same level of the market structure." Topco Associates, 405 U.S. at 608.   An agreement between two fish markets to fix the price of trout is a horizontal agreement.

Some agreements to conspire contain both vertical and horizontal elements.   Those agreements are referred to as "hub and spoke" agreements.   Continuing with the fish supply analogy, if five fish markets enter into vertical agreements with the same fisherman with the common understanding they would each sell his trout at 5% above the market price, this series of agreements between the fisherman (the hub) and the fish markets (the spokes) may constitute a hub and spoke conspiracy.   The key element of a hub and spoke conspiracy is the horizontal agreement or unity of purpose between the fish markets to use the same fisherman and set their prices at 5% above market.   This horizontal agreement is called the "rim" of the hub and spoke conspiracy.   See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, 552 F.3d 430, 435 (6th Cir. 2008).

Vertical, horizontal, and hybrid hub and spoke agreements to conspire can be alleged through either direct evidence or circumstantial evidence.   Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." Hyland v. HomeServices of America, Inc., 771 F.3d 310, 318 (6th Cir. 2014) (quoting In re Baby Food Antitrust Litig., 166 F.3d 112, 118 (3d Cir. 1999)) (internal quotation marks omitted).   An email between the five fish markets documenting their agreement would constitute direct evidence of their conspiracy to fix the price of trout.

Not surprisingly, "the element of agreement . . . is nearly always established by circumstantial evidence, as conspirators seldom make records of their illegal agreements."  In re Se. Milk Antitrust Litig., 801 F. Supp. 2d 705, 714 (E.D. Tenn. 2011) (quoting United States v. Short, 671 F.2d 178, 182 (6th Cir. 1982)) (internal citations omitted).   Circumstantial evidence

must include both parallel conduct and at least one "plus factor." See Twombly, 550 U.S. at 553, 557 (reversing Second Circuit holding that "plus factors are not required to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal"). Parallel conduct between the co-conspirators may consist of parallel adoption of certain policies or parallel pricing changes. See, e.g., In re Cast Iron Soil Pipe & Fittings Antitrust Litig., 2015 WL 5166014, at *11 (E.D. Tenn. Jun. 24, 2015). When alleging parallel conduct, a plaintiff must "place[] [that conduct] in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Twombly, 550 U.S. at 557. "The relevant question when considering circumstantial evidence of a conspiracy is do the factual allegations point to nothing more than parallel conduct of the sort that is the product of independent action, or do they plausibly raise an inference of unlawful agreement." C.S. Sewell, 2018 WL 6591429, at *3 (quoting Erie County, 702 F.3d at 869) (internal quotation marks omitted). "Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." Twombly, 550 U.S. at 553-54 (quoting Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41 (1954) and Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993)) (internal quotation marks omitted). Thus, parallel conduct, while necessary, is not alone sufficient to allege an agreement to conspire.[9]

---

[9] Plaintiffs argue that they need not allege any parallel conduct to establish circumstantial evidence of the conspiracy. (Doc. No. 623 at 15 n.16). The resounding majority of courts examining circumstantial evidence of an antitrust conspiracy hold that circumstantial evidence consists of parallel conduct plus additional factors tending to make a conspiracy plausible. See Erie County, 702 F.3d at 868; Lifewatch Services Inc. v. Highmark Inc., 902 F.3d 323, 333 (3d Cir. 2018) ("For circumstantial evidence of an agreement, . . . a plaintiff must allege both parallel conduct and something 'more,' which we have sometimes called a 'plus factor.'"). See also Gelboim v. Bank of America Corp., 823 F.3d 759, 781-82 (2d Cir. 2016); Park Irmat Drug Corp. v. Express Scripts Holding Co., 911 F.3d 505, 516 (8th Cir. 2018); SD3, LLC v. Black & Decker (U.S.) Inc., 801

17

The Sixth Circuit recognizes several "plus factors" that, when combined with parallel conduct, raise a plausible inference of an antitrust conspiracy:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire. Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct.

In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 907 (6th Cir. 2009) (quoting Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1009 (6th Cir. 1999)). Courts review these plus factors holistically rather than in isolation. See Erie County, 702 F.3d at 870. A plaintiff must allege at least one plus factor in addition to parallel conduct. The Sixth Circuit weighs the first of these plus factors—whether the defendant's actions, if independent, would be against its own economic self-interest—most heavily. See Re/Max Intern., Inc., 173 F.3d at 1009 ("Ordinarily, an affirmative answer to [the contrary to economic self-interest] factor[] will consistently tend to exclude the likelihood of independent conduct.").

The Court now separately addresses the agreements to conspire alleged in the Multifamily and Student Complaints.

### 1. Multifamily Complaint

Multifamily Plaintiffs allege that RMS Client Defendants used RealPage's RMS to fix the prices of their rental properties above market and "agreed to participate in the data co-operative and price their multifamily rental units according to RealPage's RMS." (Doc. No. 530 ¶ 5). They characterize this as a straightforward horizontal price-fixing agreement between competitors in the

---

F.3d 412, 424 (4th Cir. 2015); In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig., 28 F.4th 42, 46-47 (9th Cir. 2022).

multifamily housing market, using RealPage as an intermediary to effectuate the conspiracy. (See Doc. No. 673 at 36:13-19). Plaintiffs reject the characterization of the alleged agreement as a hub and spoke conspiracy because "RealPage is [not] in a true vertical relationship to these property defendants. They're a facilitator. They're not in the real estate business." (See id. at 14:9-12).

In contrast to Plaintiffs' characterization, Defendants argue that Plaintiffs have alleged, at most, a hub and spoke conspiracy with no rim—*i.e.*, a series of vertical agreements between RealPage and RMS Client Defendants, but no horizontal agreement between the competing Owner, Owner-Operator, and Manager Defendants. (Doc. No. 593 at 9-12).

The Court next turns to the vertical and horizontal elements of the alleged conspiracy.

### i. Vertical Agreement

The Court agrees with Multifamily Defendants' characterization that Plaintiffs have alleged vertical agreements between RealPage and each of RMS Client Defendants. RealPage is "the developer of an integrated technology platform that provides software solutions for the multifamily rental housing markets." (Doc. No. 530 ¶ 2). Its "software solutions" are products that RealPage provides to RMS Client Defendants, and RealPage also provides these Defendants ongoing services related to the pricing and price-monitoring of the multifamily rental properties. (See, e.g., id. ¶¶ 4, 14). This is no different from a vertical relationship between a supplier of fish (fisherman) and a seller of fish (fish market). Therefore, the Court finds that Plaintiffs have alleged vertical relationships between RealPage and each of RMS Client Defendants.

These vertical agreements are supported by allegations of direct evidence. Plaintiffs allege that each of RMS Client Defendants entered into a written contract with RealPage in which it paid to license RealPage's RMS price recommendation software. (Doc. No. 530 ¶¶ 67-193). These allegations do not require any inferences to conclude that each RMS Client Defendant entered into

19

an agreement with RealPage.  See Hyland, 771 F.3d at 318. As part of the written contract, each Defendant allowed RealPage to use its proprietary commercial data as an input to its RMS software, understanding that this data would be used by RealPage in its price recommendations to Defendants and its competitors.[10]  (See id. (alleging that each Defendant "entered a written contract, paid for, and used at least one RealPage RMS . . . to manage some or all of its . . . units . . ., knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow [the] Defendant . . . to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.").  Likewise, Plaintiffs allege that each Defendant knew that the price recommendations it received from RealPage would incorporate the proprietary commercial data of RealPage's other clients, including its horizontal competitors.  (See id. ¶ 287 ("Defendant RealPage informs both current and prospective clients that its RMS utilizes its horizontal competitors' rent data."); id. ¶ 289 ("RealPage also tells its RMS clients exactly whose non-public data is being used for pricing decisions.")).

### ii.  Horizontal Agreement

The heart and soul of Multifamily Plaintiffs' allegations is the alleged horizontal agreement between RMS Client Defendants to use RealPage to fix the prices of their multifamily rental properties above market rates.  (See Doc. No. 530 ¶ 6).  The Multifamily Plaintiffs allege that this horizontal agreement had the following "overarching principles":

> (1) all members, who were otherwise horizontal competitors, would share the proprietary data necessary for RealPage's RMS to generate rental price recommendations; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) knowing that cooperation

---

[10] The Court acknowledges that Multifamily Plaintiffs have moved to withdraw the allegation that Defendant AIR Communities is contractually required to share its confidential pricing and lease information with RealPage, which the Court granted.  (See Doc. Nos. 680, 684).

was essential to the successful operation of the scheme, all members would abide by RealPage's price and supply decisions generated by RMS.

(Id.).

Plaintiffs argue that they have alleged both direct and circumstantial evidence of this agreement, while Defendants argue that the allegations are too deficient to plausibly allege a horizontal conspiracy.

### a. Direct Evidence

Multifamily Plaintiffs argue that they have alleged direct evidence of a horizontal conspiracy through a statement made by an executive employee of one of Defendants, ECI Group, Inc. ("ECI"), which RealPage used in a case study posted to its website. (See Doc. No. 673 at 11:10-13 and 12:24-15:8. See also Doc. No. 530 ¶ 9.) In that case study, the ECI executive stated:

> The design and functionality of [RealPage's] LRO offers detailed insight into how actual competitors impact pricing strategies . . . With LRO we rarely make any overrides to the [pricing] recommendations . . . [W]e are all technically competitors, LRO helps us to work together . . . to make us all more successful in our pricing . . . . LRO is designed to work with a community in pricing strategies, not work separately.

(Doc. No. 530 ¶ 9; id. ¶ 9 n.10). According to Plaintiffs, this case study was "basically an invitation to all other property owners and managers throughout the country about what RealPage could do for you." (Doc. No. 673 at 13:7-10). Plaintiffs argue that "[y]ou can't get any more [direct] than . . . a competitor saying . . . although we're technically competitors, we work with our competitors on pricing strategy." (Id. at 14:19-22).

The Court finds that the ECI executive's statement is not, independently, direct evidence of a horizontal conspiracy. The statement requires the Court to infer that ECI and RealPage's other LRO clients worked together as competitors to accomplish an unlawful purpose. Indeed, several inferences are necessary to conclude that LRO clients "rarely make any overrides" to RealPage's pricing recommendations in order to engage in price-fixing. The ECI statement is not the type of

21

evidence "tantamount to an acknowledgment of guilt" that courts credit as direct evidence of a conspiracy. Hyland, 771 F.3d at 318.

While the Court does not find that ECI's statement is direct evidence, the Court does consider it to be significant, along with the other circumstantial evidence alleged in the Multifamily Complaint which is described below.

### b. Circumstantial Evidence – Parallel Conduct

Multifamily Plaintiffs allege circumstantial evidence, including allegations that RMS Client Defendants engaged in parallel conduct. The parallel conduct consists of a parallel change in pricing strategy "once a critical level of RealPage RMS adoption had been reached around January 2016." (Doc. No. 623 at 9). The new pricing strategy prioritized raising rent prices even if doing so resulted in higher vacancy rates. (See Doc. No. 530 ¶¶ 203-04). Plaintiffs further allege that Defendants began raising their rent prices in parallel fashion upon adopting their new pricing strategies. (Id. ¶ 337).

Defendants argue that Plaintiffs' allegations of parallel strategy and parallel pricing do not constitute "uniform business conduct." (Doc. No. 593 at 14). They set a high pleading bar to demonstrate parallel conduct, arguing that Plaintiffs must allege that Defendants all became clients of RealPage close-in-time to each other, used the same RMS software offered by RealPage, accepted RealPage's price recommendations 100% of the time, and only received and accepted price increases from RealPage, to the exclusion of any price decreases. (See id. at 11-15). Because Plaintiffs have not alleged any of this parallel behavior, Defendants argue that Plaintiffs have not alleged any parallel conduct necessary to show circumstantial evidence of a horizontal conspiracy. (Id.).

As an initial matter, the Court disagrees with Defendants that Plaintiffs' allegations of parallel changes to pricing strategy and parallel pricing are not evidence of parallel conduct. Certainly, courts accept allegations of close-in-time agreements as evidence of a horizontal conspiracy, as Defendants argue Plaintiffs must do here. See, e.g. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 216-18 (1939) (defendants each responded to a July 11, 1934 letter agreeing to increase movie prices for the 1934-1935 season). But temporal proximity of the parallel conduct is only one factor, and the cases on which Defendants rely do not hold differently. For example, the Eighth Circuit held that in one instance, actions "executed under dissimilar circumstances and separated by six months, d[o] not constitute parallel conduct," but further stated that "[w]e do not hold that actions taken within six months of each other can never constitute parallel conduct." Park Irmat Drug Corp. v. Express Scripts Holding Co., 911 F.3d 505, 517 (8th Cir. 2018).[11]

_____

[11] The Multifamily Defendants' other cases are similarly unpersuasive. Interstate happened to involve a close-in-time agreement among competitors to fix prices, but the Supreme Court did not acknowledge this temporal proximity in its opinion, indicating that it was, at most, only a factor in reaching the conclusion that the defendants had conspired to price-fix. See Interstate, 306 U.S. at 226-27. In a case concerning musical instrument advertising, the Ninth Circuit held that "[a]llegations of such slow adoption [over several years] of similar policies does not raise the specter of collusion." In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1195-96 (9th Cir. 2015). Unlike this case, however, the court recognized that "[a]ll of the manufacturer defendants were dealing with the same important customer, Guitar Center, which ostensibly exercised its considerable market power to demand similar terms from each manufacturer for its own benefit." Id. at 1196. The court held that "[t]he manufacturers' similar response to this market pressure is a hallmark of independent parallel conduct—not collusion." Id. The Musical Instruments case is not analogous to this case. RMS Client Defendants are not reliant on RealPage to sell their products as the musical instrument supplier were reliant on Guitar Center. After all, RealPage enticed RMS Client Defendants to "outperform the market," primarily through raising rent prices. It did not have the ability to coerce RMS Client Defendants that Guitar Center had. In Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC, the court found that policies that were "different in their particulars, their timing, and their outcomes" were not parallel. 2022 WL 4017895, at *6 (W.D.N.Y. Sep. 2, 2022). Here, Plaintiffs allege that the parallel pricing strategies were similar in their particulars and outcomes, and the agreements to provide RealPage sensitive data and use others' sensitive data are identical. Thus, unlike Mosaic Health, the only difference in the conduct alleged here is the timing.

23

Parallel conduct can be any "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." Twombly, 550 U.S. at 556 n.4. Courts accept allegations of parallel pricing and parallel changes in policies or strategies as evidence of parallel conduct. See, e.g., In re Cast Iron Soil Pipe & Fittings Antitrust Litig., 2015 WL 5166014, at *11 ("parallel pricing [plus] additional allegations" may state a Sherman Act Section 1 claim); Re/Max Intern., Inc. v. Realty One, Inc., 173 F.3d 995, 1003 (6th Cir. 1999) (defendants' joint adoption of adverse splits policy, combined with the fact that this policy would not be in either defendant's economic self-interest to implement independently, "would entitle a reasonable jury to conclude that Realty One and Smythe Cramer conspired to adopt adverse commission splits against Re/Max."). Thus, there is no infirmity with the *type* of parallel conduct the Multifamily Plaintiffs allege.

Still, the Court must evaluate whether the Multifamily Plaintiffs have plausibly alleged parallel changes to pricing strategy and parallel pricing.

### i. Allegations of Parallel Changes to Pricing Strategy

Multifamily Plaintiffs allege that "[b]efore the widespread adoption of RealPage's RMS, competition in the multifamily rental housing market was driven by property owners' and managers' desire to keep 'heads in beds'—in other words, maintain the highest possible occupancy levels and keep turnover among tenants to a minimum." (Doc. No. 530 ¶ 202). By 2016, RealPage's clients, including RMS Client Defendants, had adopted a different pricing strategy. (Id. ¶¶ 32-34). This new strategy was to prioritize increasing prices regardless of apartment vacancies or market downturns. (Id. ¶ 34). Previously, multifamily rental lessors, drawn by market forces, had prioritized increasing occupancy, which could require reducing rent prices from time

to time to fill vacant rentals. (Id. ¶ 202-03). This previous strategy is referred to as the "heads in beds" strategy. (Id.). The change in pricing strategy from "heads in beds" to "price over volume" is the meat of Plaintiffs' parallel conduct allegations. (See Doc. No. 673 at 56:12-14 ("The main parallel conduct that we're relying on is the fundamental change in the industry, that they all went from heads in beds to a revenue maximization.")).

Plaintiffs offer both statements from individual Defendants acknowledging this change in strategy and a regression analysis to support this strategy change. Examples of the statements include:

- In 2017, then-CEO of RealPage, Steve Winn, stated that one client, Morgan Communities, increased its profits by operating at a vacancy rate that "would have made [that property manager's] management uncomfortable before." (Doc. No. 530 ¶ 33). Specifically, "[a]fter outsourcing rent prices and lease terms to RealPage, the company began targeting 3%-4% revenue growth while operating at a 95% occupancy rate (i.e., 5% vacancy rate)." (Id.).

- A senior vice president at Morgan Group, David Hannan, acknowledged in 2011: "My generation grew up worshipping the occupancy gods. We learned that if you were not 95 percent-plus occupied, the asset was failing. But that's not necessarily true anymore . . . [RealPage] totally turns the industry upside down." (Id. ¶ 235).

- Bell Partners' Chief Financial Officer stated in 2011 that Bell's previous "strategy was to push occupancy to help offset rent declines," and that after adopting RealPage's RMS, "[n]ow, clearly, the focus is on maximizing rents." (Id.).

- Witness 7, a former RealPage Pricing Advisor, (see id. ¶ 237), disclosed that RealPage repeatedly told its clients "you can run a property with fewer people living there, and still meet or exceed what you've made in the past." (Id. ¶ 242).

- A RealPage "Revenue Management System, Quick Reference Guide" from 2022 states that "RealPage['s] Revenue Management system allows you to continuously maximize asset value by leveraging data to consistently reduce vacancy and maximize rent." (Id. ¶ 300).

- The CEO of Camden Property Trust, Ric Campo, "admitted that Camden's turnover rates increased around 15 percentage points in 2006 after implementing YieldStar." (Id. ¶ 252). Nevertheless, Camden's revenue grew over 7% for that property in its first year. (Id.). Campo said, "What we found was that driving our turnover rate up actually captured additional revenue. . . . The net effect of driving revenue and pushing people out was $10 million in income." (Id.).

Plaintiffs also offer regression analyses of four markets demonstrating that prior to 2016, rent prices were correlated with vacancy rates. (Id. ¶¶ 351-65). Simply put, when vacancy rates increased, rent prices decreased, and vice versa. (Id.). In contrast, the regression analyses show that after 2016, rent prices in these markets became far less correlated with vacancy rates. (Id.). For instance, in Atlanta from 2011 to 2016 "there was a negative relationship between effective rents and vacancy rates . . . show[ing] that an increase in vacancy rates (supply) generally resulted in a decrease in rental price." (Id. ¶ 356). During this 2011-2016 period, the regression analysis showed that "83% of rental price variations in the Atlanta Submarket can be explained by the operative vacancy rate." (Id.). From 2016 to 2022, "the previously strong relationship between vacancy rates and rental prices had been severed," with only 19.3% of rental price variations able to be explained by vacancy rates. (Id. ¶ 358). The regression analyses tell similar stories in Orlando, Dallas, and Phoenix. (Id. ¶¶ 361-65). Finally, while Plaintiffs did not perform a full regression analysis on the Nashville submarket, they offer a graph in the Multifamily Complaint showing that "despite rising vacancies, with the help of RealPage, Defendants were able to continue to raise rents year-over-year-over-year, demonstrating the disconnect between supply and demand." (Id. ¶ 34 and Figure 3). Plaintiffs argue that these regression analyses support their allegation that as of 2016, Defendants had adopted a seismic shift in pricing strategy from "heads in beds" to prioritizing rent increases over occupancy. (Doc. No. 623 at 32).

Defendants argue that these allegations do not plausibly point to any parallel change in pricing strategy among Defendants. They correctly point out that multiple statements concerning the change in strategy were made before 2016, indicating that there was no industry shift in 2016. (See Doc. No. 673 at 63:12-22). They do not offer any argument concerning deficiencies with Multifamily Plaintiffs' regression analyses in four submarkets.

At this stage of the case, the Court finds that Plaintiffs have plausibly alleged that Defendants engaged in parallel conduct when they each became RealPage RMS clients and began prioritizing raising rent prices over decreasing vacancy rates. This parallel conduct is consistent with RealPage's pledge to its RMS clients that it will help them "outperform the market," primarily through raising rent prices. Logic dictates and the Court understands Plaintiffs' allegations to state that by 2016 the effects of this strategy change could be measured, at least in the four submarkets of Atlanta, Orlando, Phoenix, and Dallas.

Ultimately, Plaintiffs need not allege that Defendants simultaneously adopted this new pricing strategy for it to be considered parallel conduct. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. . . . Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." Interstate Circuit v. United States, 306 U.S. 208, 227 (1939) (internal citations removed). Moreover, the Supreme Court has found that horizontal competitors can join a conspiracy even though:

> in negotiating and entering into the first agreements [they] . . . acted independently of the others, negotiated only with [the hub defendant], desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that [the hub defendant] make such an agreement with any of the others, and had no discussions with any of the others. It is not clear at what precise point of time each appellee became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement. But it is clear that as the arrangement continued each became familiar with its purpose and scope.

United States v. Masonite Corp., 316 U.S. 265, 274-75 (1942) (internal citations omitted).

Finally, while the Multifamily Complaint does not contain regression analyses of every submarket Plaintiffs have alleged, it need not do so for the Court to find it plausible that, following discovery, Plaintiffs will be able to show similar results in the other submarkets. See, e.g., Re/Max

27

<u>Intern.</u>, 173 F.3d at 1003 (denying defendants' summary judgment motion, though plaintiff's expert determined defendants' combined market power in only nine of 14 alleged markets). The Multifamily Complaint specifically alleges each of the 45 geographic submarkets that are the focus of the allegations, which "give[s] fair notice . . . to enable the opposing party to defend itself effectively." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011) (discussing pleading standards articulated by the Supreme Court). At this stage of the case, Plaintiffs need not do more.

### ii.    Allegations of Parallel Pricing Increases

Multifamily Plaintiffs also allege parallel conduct in the form of parallel price increases in nine of the Multifamily Complaint's alleged submarkets. To show these parallel price increases, Plaintiffs purchased "Defendant-specific pricing data" from an allegedly respected industry data source, CoStar.[12] (Doc. No. 623 at 16). They allege that price graphs included in the Multifamily Complaint depict "perfectly coordinated price increases by [RMS Client] Defendants in each MSA [metropolitan statistical area] . . . during and throughout the Conspiracy Period." (Doc. No. 530 ¶ 337).

Defendants argue that these graphs do not show what Plaintiffs describe. (Doc. No. 593 at 32-34. <u>See also</u> Doc. No. 673 at 101:1-102:24]. The graphs show only that between 2013 and 2023, rent prices increased in each of the markets. Plaintiffs do not allege that these rent prices are supracompetitive, nor do they exclude the possibility that the rent increases were caused by "a period of inflation in this country where we could use more housing." (Doc. No. 673 at 94:1-4; <u>see also</u> Doc. No. 593 at 33). Moreover, Defendants argue that far from showing parallel pricing, the graphs actually show the opposite—"different [RMS Client] Defendants' average prices

---

[12] These nine regional sub-markets are Atlanta, Boston, Dallas, Denver, Miami, Nashville, New York, Portland, and Washington, D.C. (<u>See</u> Doc. No. 530 ¶ 338).

28

moving *in different directions*, with many [RMS Client] Defendants' average prices going *down* after 2016." (Doc. No. 593 at 32-33 (emphasis in original). <u>See also</u> Doc. No. 673 at 101:1-102:24).

The Court agrees with Defendants that the graphs show, at most, that rent prices increased between 2013 and 2023 in each of the nine submarkets. The Court can discern no difference between the 2013 to 2016 pre-conspiracy period and the 2016 to 2023 period after the alleged conspiracy began. When the Court asked Plaintiffs' counsel what difference, if any, existed between the pre-conspiracy and post-conspiracy periods, counsel stated the chart "consistently . . . almost in line rais[es] rents across all of these defendants." (Doc. No. 673 at 45:24-46:16). Nor do the graphs indicate any plausible conspiracy; it is hardly surprising that rent prices increased between 2013 and 2023 even in a competitive, normally-functioning market.

The Court, however, acknowledges that at the motion to dismiss phase of the case, it "need not . . . engage in a *Daubert*-like analysis of Plaintiffs' statistical pleadings" and "must[] accept as true Plaintiffs' factual assertions regarding pricing and other data." <u>City of Philadelphia v. Bank of America Corp.</u>, 498 F. Supp. 3d 516, 527-28 (S.D.N.Y. 2020). However, it is also true that courts do not credit charts and analyses that are "as consistent with parallel, market-following behavior . . . as they are with participation in a price-fixing scheme." <u>In re Commodity Exchange, Inc. Gold Futures & Options Trading Litig.</u>, 328 F. Supp. 3d 217, 227 (S.D.N.Y. 2018). Nor is the Court "bound to accept . . . unwarranted inferences." <u>Blankenship v. City of Crossville</u>, 2017 WL 4641799, at *2 (M.D. Tenn. Oct. 17, 2017) (quoting <u>Mulbarger v. Royal All. Associates, Inc.</u>, 10 Fed. App'x. 333, 335 (6th Cir. 2001)).

Accordingly, while the Court finds that Multifamily Plaintiffs have adequately alleged parallel conduct through Defendants' change in pricing strategies following their adoption of

RealPage's RMS, the Court does not find the allegations of parallel pricing to "nudge[] their claims across the line from conceivable to plausible." <u>Twombly</u>, 550 U.S. at 570.

### c. Circumstantial Evidence – Plus Factors

Multifamily Plaintiffs allege several plus factors in addition to parallel conduct. The most important of these is the allegation that RMS Client Defendants' price-raising during periods of high vacancy and/or market downturns is inconsistent with their individual economic self-interest. (Doc. No. 530 ¶ 244). <u>See In re Travel Agent Comm'n Antitrust Litig.</u>, 583 F.3d at 907-908. But, to be clear, there are additional plus factors, including Defendants' "exchange [of] competitively sensitive information," Defendants' "motive, opportunities, and invitations to collude," and characteristics of the multifamily housing market that make it more susceptible to price-fixing conspiracies. (<u>See id.</u> ¶ 367). These market characteristics include that the market "(i) is highly concentrated; (ii) has high barriers to entry for would-be competitors; (iii) has high switching costs for renters; (iv) has inelastic demand; and (v) offers a fungible product." (<u>Id.</u>).

Defendants separately attack each of Plaintiffs' plus factors as deficient. (<u>See</u> Doc. No. 593 at 17-23). Specifically, they contend Plaintiffs have not actually alleged that Defendants adopted price over volume strategies, instead alleging only "that vacancy rates for *some* Lessors in some locations increased at *some* times." (<u>Id.</u> at 17 (emphasis in original)). Next, they dispute that Plaintiffs have alleged no motive to conspire, as "maxmiz[ing] profits" or "optimizing rents based on supply and demand" are simply individual motives to use RealPage's RMS. (<u>Id.</u> at 18). Defendants also dismiss Plaintiffs' contention that Defendants had opportunities to conspire through participation in trade associations. (<u>Id.</u> at 19). They further argue that Plaintiffs have not alleged that RMS Client Defendants shared their sensitive pricing and supply information with each other, and that any horizontal competitor data they did have access to was aggregated and

30

anonymized.  (Id. at 19-20).  Finally, they believe that Plaintiffs' allegations concerning the multifamily housing market structure "do not imply collusion without more."  (Id. at 22-23).

At the outset, the Court notes that Defendants' approach of separately evaluating and dissecting each plus factor is legally flawed.  The Court must assess plus factors holistically.  See Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698-99 (1962).  In Continental Ore, the Supreme Court highlighted the importance of taking a holistic approach:

> It is apparent from the foregoing that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits.  We think this was improper.  In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.

370 U.S. at 698-99.

Viewing all of the alleged circumstantial evidence holistically, including the parallel conduct discussed earlier, the Court finds that the Multifamily Complaint's most persuasive evidence of horizontal agreement is the simple undisputed fact that each RMS Client Defendant provided RealPage its proprietary commercial data, knowing that RealPage would require the same from its horizontal competitors and use all of that data to recommend rental prices to its competitors.  (See, e.g., Doc. No. 530 ¶¶ 31, 287, 289).  In doing so, RealPage would make true its vow to its RMS clients to "outperform the market," primarily by increasing rent prices.  It would clearly not be in any individual Defendant's economic self-interest to contribute its data to RealPage without knowing that it would benefit from its horizontal competitors doing the same. Put another way, the contribution of sensitive pricing and supply data for use by RealPage to recommend prices for competitor units is in Defendants' economic self-interest if and only if Defendants know they are receiving in return the benefit of their competitors' data in pricing their own units.  While Defendants may not have contracted with RealPage close-in-time to one another,

31

their data contributions still constitute parallel behavior.  These allegations are bolstered by other allegations:

- "RealPage discloses to its RMS clients exactly whose non-public data is being used for pricing decisions.  For each client, including the Owners, Owner-Operators, and Managing Defendants, RealPage maintains a 'peer list' of that client's competitors within a specific distance and whose transaction data will be used as an input in RealPage's RMS for that client's specific property.  Peer lists explicitly state that the competitors listed will be used 'to determine the magnitude of a change in rent. . . .'  In fact, clients, including the Owners, Owner-Operators, and Managing Defendants, are able to review and comment on their peer list, and can even request that specific competitors are included on the list."  (Id. ¶ 33).

- Defendants paid RealPage substantial monthly fees of as much as $1 to $2 per unit for RealPage's pricing recommendations, leading to the inference that Defendants' intended to abide by those recommendations.  (Id. ¶ 14).

- Defendants used either RealPage-employed pricing advisors or RealPage-trained revenue managers to closely monitor their adherence to RealPage's price recommendations.  (Id. ¶ 17).  For those using pricing advisors, each pricing advisor oversaw multiple horizontal competitors.  (Id. ¶ 280).

- Defendants could determine who among their competitors were also RealPage clients because RealPage provided them with the property addresses using RealPage's RMS.  (Id. ¶¶ 12, 245).

- RealPage offered opportunities for horizontal competitors to engage directly with one another through "webinars, screen-sharing training modules, frequent calls, in-person 'roundtables,' hosted happy hours, and annual conferences."  (Id. ¶¶ 37, 384).  Competitors also interact with each other through trade associations.  (Id. ¶¶ 383, 385).

- RealPage enforced adherence to its pricing recommendations through assigning pricing advisors to its clients, providing "lease compliance reports" listing the names of individual employees who overrode price recommendations, requiring employees to provide business justifications for price overrides, and offering some clients quarterly "performance to market" meetings "designed to identify how compliant the client was with RealPage's pricing recommendations during the prior quarter."  (Id. ¶¶ 17-19, 259-64, 271).

- The multifamily housing market is unique compared to other product markets because at any given time, the available inventory is much smaller than the total market inventory, and there are significant costs to moving that may make consumers more likely to renew their leases even if their rents are raised above market prices.  (Id. ¶¶ 367, 372-76).  This unique structure gives renters less power to choose alternative housing options than in a more traditional buyer/seller commodity structure.[13]

_____

[13] Consider the fish market example again.  If five fish markets conspire to sell trout at 5% above market price and do not together have a monopoly on the relevant market, a consumer could simply

These allegations touch on multiple plus factors recognized by the Sixth Circuit, including the exchange of commercially sensitive information and the existence of a common motive to conspire. See In re Travel Agent Comm'n Antitrust Litig., 583 F.3d at 907 (quoting Re/Max Int'l, Inc., 173 F.3d at 1009). See also Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."). Taken together, they support a "reasonable expectation that discovery will reveal evidence of [an] illegal agreement." Twombly, 550 U.S. at 556. Indeed, the allegations describe a conspiracy that a former Federal Trade Commission Chair, Maureen Ohlhausen, believes is unlawful under the antitrust laws:

> Just as the antitrust laws do not allow competitors to exchange competitive sensitive information directly in an effort to stabilize or control industry pricing, they also prohibit using an intermediary to facilitate the exchange of confidential business information. Let's just change the terms of the hypothetical slightly to understand why. Everywhere the word 'algorithm' appears, please just insert the words 'a guy named Bob.' Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.

(Doc. No. 530 ¶ 229). As Ohlhausen explained, whether Defendants shared their sensitive information with each other or through an intermediary, their knowledge that that information would be used to price each other's units is circumstantial evidence of a conspiracy. (Id.).

Defendants urge the Court to dismiss this case based on a recent District of Nevada decision, Gibson v. MGM Resorts International, 2023 WL 7025996 (D. Nev. Oct. 24, 2023). (See Doc. No. 639 at 2, 6). Gibson concerned a revenue management system that the plaintiffs alleged was used by hotels on the Las Vegas Strip to increase nightly room rates. Gibson, 2023 WL 7025996, at *1. On their face, these allegations appear to offer a close analogy to this case, but

_____

purchase her trout at a sixth fish market or grocery store not a part of the conspiracy. She may spend a little extra on gas, but the cost of simply shopping elsewhere is low.

the devil is in the details.  In granting the defendant hotels' motion to dismiss, the court found that "it is unclear whether the pricing recommendations generated to Hotel Operators include [competitors'] confidential information fed in; perhaps they only get their own confidential information back, mixed with public information from other sources."  Id. at *5.  Here, the Multifamily Complaint unequivocally alleges that RealPage's revenue management software inputs a melting pot of confidential competitor information through its algorithm and spits out price recommendations based on that private competitor data:

> RealPage also tells its RMS clients exactly whose non-public data is being used for pricing decisions.  For each client, including Owners, Owner-Operators, and Managing Defendants, RealPage maintains a "peer list" of that client's peers whose transaction data will be used as an input in RealPage's algorithm for that client's pricing.  Peer lists explicitly state that the competitors listed will be used "to determine the magnitude of a change in rent . . . ."  Clients, including Defendants, are able to review and comment on their peer list, and they can even request that specific competitors are included on the list.  RealPage then quickly pushes the non-public, daily, real-time data from those competitors' properties into an algorithm to influence RealPage's pricing decisions.  In this way, each Owner Defendant, Owner-Operator, and Managing Defendant consciously commits to using non-public data from its direct horizontal competitors to price its own units.

(Doc. No. 530 ¶ 289).  This critical difference between the Gibson complaint and the Multifamily Complaint destroys the analogy.  As the Gibson court acknowledged, "a successful hub and spoke theory of Sherman Act liability based on the use of algorithmic pricing depends in part on the exchange of nonpublic information between competitors through the algorithm."  Gibson, 2023 WL 7025996, at *4.  That is what the Multifamily Plaintiffs have alleged here.

### 2. Student Housing Complaint

Student Plaintiffs allege that Lessors[14] used RealPage RMS to fix the prices of their rental properties above market and "agreed to follow [its] recommendations, on the mutual understanding that competing [L]essors would do the same." (Doc. No. 527 ¶ 6). They characterize this as a horizontal price-fixing agreement subject to *per se* analysis. (Doc. No. 617 at 27). Lessors argue that Plaintiffs have alleged, at most, a rimless hub and spoke conspiracy. (Doc. No. 588 at 7).

The Court next considers both the vertical and horizontal elements of the conspiracy alleged in the Student Complaint.

### i. Vertical Agreement

Student Plaintiffs allege vertical agreements between RealPage and Lessors. Each Lessor enters into an annual license agreement with RealPage and provides its proprietary commercial data as an input to the RMS software, knowing that this data will be used by RealPage in its price recommendations to that Lessor and its horizontal competitors. (Id. ¶¶ 5-6, 93). Further, Lessors agree to follow the price recommendations by requiring their staff to justify in writing any deviation from RealPage's recommended pricing and to allow RealPage to monitor compliance through its pricing advisors on a daily or weekly basis. (Id.). Lessors do not address whether a vertical conspiracy exists between them and RealPage. (Doc. No. 588 at 7).

### ii. Horizontal Agreements

The glue holding Student Plaintiffs' alleged price-fixing conspiracy together is the alleged horizontal agreement between Lessors to "agree[] to follow [RealPage's] recommendations, on the mutual understanding that competing lessors would do the same." (Doc. No. 527 ¶ 6).

---

[14] "Lessors" refer to Defendants to the Student Complaint who are clients of RealPage RMS. Student Defendants refer to all of Defendants named in the Student Complaint, including RealPage and the Thoma Bravo Defendants.

Horizontal agreements can be alleged and eventually proven through direct evidence or circumstantial evidence.  Hyland, 771 F.3d at 318.

### a. Direct Evidence

Student Plaintiffs offer no direct evidence of a horizontal conspiracy.  (See Doc. No. 588 at 11 ("Lacking direct evidence, Plaintiffs rely on ostensible circumstantial evidence of a conspiracy."); see also Doc. No. 617 at 5-10 (not contesting Defendants' assertion that the Complaint alleges no direct evidence of a conspiracy and omitting any reference to such evidence). Thus, the Court examines Plaintiffs' allegations of circumstantial evidence.

### b. Circumstantial Evidence – Parallel Conduct

Student Defendants argue that Student Plaintiffs must allege some "uniform business conduct or other concerted action by [Lessors]" to establish parallel conduct.  (Doc. No. 588 at 12 (internal quotation marks and citation omitted)).  They argue that the Student Complaint lacks any allegation that Lessors responded to RealPage's pitch or purchased its software at or around the same time, or even allegations demonstrating any temporal proximity between any Lessors' adoption of RealPage products.  (Doc. No. 588 at 12).  Defendants then argue that the Student Complaint actually contradicts any allegation of parallel conduct because it admits that: "(1) some [Lessors] use different [RealPage] RMS products; (2) some use RealPage's 'Pricing Advisors,' but others rely on their own employees; and (3) some ha[ve] different configurations of RealPage's RMS software enabled."  (Id. at 13).  Last, Defendants maintain that Plaintiffs allege no parallel price movements—or even that two Lessors were ever recommended the same or similar prices— which they claim would be expected in a coordinated algorithmic price-fixing case.  (Id.).

Plaintiffs disagree, arguing that Lessors engaged in parallel data-sharing and adopted a parallel pricing strategy change as a result of their horizontal agreement. (See id. at 8; Doc. No. 527 ¶ 63).

### i. Allegations of Parallel Data-Sharing

Student Plaintiffs allege that all Lessors "shared [their] competitively-sensitive business data with RealPage and received above-market rental pricing determination based on [the] aggregation of that data." (Doc. No. 588 at 8). They rely upon allegations that reflect parallel conduct by the individual Lessors that goes beyond Lessors' mere use of RealPage RMS. For example, Plaintiffs allege that Lessor Greystar told its property managers that it "always wanted" them to accept RealPage's pricing recommendations and did so 98% to 99% of the time. (Doc. No. 527 ¶ 56). Likewise, Lessor BH Management had RealPage "create[] a special private website for BH Management called 'BH Corporate University,' which it uses to train BH Management on how to use the RealPage software" to, among other things, set higher rent prices. (Id. ¶¶ 57, 63). Lessor Campus Advantage implements RealPage pricing recommendations "automatically unless they [a]re specifically overridden by Campus Advantage employees," who "have to enter reasons . . . if it cho[oses] not to accept them." (Id. ¶ 58). Similarly, Lessor Cardinal requires employees to provide reasons when they decline RealPage's rent price recommendations. (Id. ¶ 59).

These allegations, taken as a whole, demonstrate parallel, common, sequential conduct. See Kleen Prods. v. Packaging Corp. of Am., 775 F. Supp. 2d 1071, 1077 n.5, 9 (N.D. Ill. 2011). Students Defendants' qualms about variations in temporal proximity are overstated. (Doc. No. 588 at 12). See Interstate Circuit, 306 U.S. at 227; Masonite Corp., 316 U.S. at 274-75. In any case, every year each Lessor renews its license with RealPage, re-affirming its commitment to the data-sharing agreement. (See, e.g., Doc. No. 527 ¶ 93 ("Because RealPage's revenue was largely

derived from 'license and subscription fees relating to [RealPage's] on demand software solutions, typically licensed over one years terms…")).  Plaintiffs need not plead that Lessors utilize the same RealPage RMS, as Plaintiffs allege that each of these services uses proprietary commercial information of horizontal competitors, (Doc. No. 527 ¶¶ 51-53, 54, 67), or that Lessors implement RealPage's services, like its Pricing Advisors, in precisely the same way.  See, e.g., In re Domestic Airline Travel Antitrust Litig., 221 F. Supp. 3d 46, 69 (D.D.C. 2016) ("Plaintiffs do not need to demonstrate that Defendants [acted] in exactly the same way in order to adequately allege parallel conduct.").  Last, Defendants' argument that Plaintiffs do not plead that RealPage's pricing recommendations were the same or similar among competing properties is a red herring.  RealPage receives data "as fine and granular as bits of sand" from Lessors. (Doc. No. 527 ¶ 9).  It uses that data, accounting for variations among properties and specific units, to increase rent prices across the board in order to fulfill its promise to Lessors that they will "outperform the market."  (Doc. No. 527 ¶ 15).  Plaintiffs do not allege a horizontal agreement to fix rents at the same price in a given market.  Rather, they allege an agreement to fix rents at higher prices than a normally-functioning market could sustain.  (See id. ¶¶ 61-64).

At bottom, Plaintiffs allege that Lessors submit real-time commercially sensitive pricing and supply data to be compiled into a common algorithm to produce "forward-looking, unit-specific pricing and supply recommendations based on [Lessors'] shared data." (Doc. No. 527 ¶ 5).  Lessors do so to achieve above-market rates.  (Id. ¶¶ 15, 140, 142).  The Court has already credited these allegations as the most persuasive evidence of horizontal agreement in the Multifamily Complaint.  Their import in the Student Complaint is no less.

38

### ii. Allegations of Parallel Changes to Pricing Strategy

Student Plaintiffs allege that "[f]ollowing widespread adoption of RealPage, Lessor Defendants swiftly and concertedly shifted from the previous competitive 'market share over price' strategy to a new collusive 'price over volume' strategy." (Doc. No. 527 ¶ 63). This allegation mirrors Multifamily Plaintiffs' pricing strategy shift allegations but accounts for differences between student and multifamily housing. Student housing rentals often align with the academic year. (Id. ¶ 95). Traditionally, "lessors—acting independently—tried to maximize occupancy . . . at the beginning of a new school term. Every day a unit was left empty was a lost opportunity to earn revenue for that day, so Lessors offered sufficiently attractive pricing to maintain maximum occupancy . . . in the form of reduced prices or promotional offers." (Id. ¶ 61). Once Lessors began using RealPage, they started raising rent prices without regard for vacancies. (Id. ¶¶ 61-64).

The Student Complaint's allegation of a pricing strategy shift has important differences from the Multifamily Complaint's similar allegation. First, Multifamily Plaintiffs allege that this pricing strategy change is supported by RealPage's pressure on RMS Client Defendants to maintain higher vacancy rates at increased rent prices. (Doc. No. 530 ¶¶ 202-03). Second, Multifamily Plaintiffs offer a regression analysis performed in four of their proposed geographic submarkets, which shows a lessening correlation between rent price and vacancy rates after the start of the allege Multifamily Defendant conspiracy in 2016. (Id. ¶¶ 351-65).

Student Plaintiffs make the same allegation of "reduced output," (id. ¶¶ 61, 80, 157, 162, 219, 231), but offer none of the same support. In fact, Student Plaintiffs allege that RealPage aided Lessors in reducing their vacancies. (See Doc. No. 527 ¶¶ 48, 63, 105). For example, RealPage touts that its RMS software is "the industry's only price optimization solution . . . that makes it

39

possible to consistently reduce vacancies and maximize rents." (Id. ¶ 48). Similarly, Plaintiffs allege that "RealPage enabled property managers to set 'top tier price[s],' and participation in the cartel allowed property managers to 'feel confident that it won't end up with empty beds at the time the semester starts." (Id. ¶ 63). Moreover, RealPage boasts not only "historically high rises in student rental prices," but also record-breaking occupancy levels of 86.2% pre-leased beds at 175 colleges and universities in 2022. (Id. ¶ 105). These allegations leave the Court to wonder how Student Defendants could have adopted a "price over volume" strategy if both price and volume are moving in the same direction.

The Court must interpret the Student Complaint's allegations in the light most favorable to Plaintiffs. The Court construes Student Plaintiffs' allegation of parallel pricing strategy change to mean that after adopting RealPage, Lessors removed the occupancy factor from their pricing decisions—regardless of their current vacancies, Lessors agree to increase prices. (See Doc. No. 527 61-64). "Price and volume" may be a better name for this strategy change than "price over volume" in the student housing context. While Student Plaintiffs' parallel pricing strategy change allegation is different from Multifamily Plaintiffs', the Court nonetheless finds that Student Plaintiffs' have plausibly alleged this parallel shift.

### c. Circumstantial Evidence – Plus Factors

The Student Complaint identifies seven plus factors: (1) high barriers to entry, (Doc. No. 527 ¶¶ 119-20); (2) high barriers to exit, (id. ¶¶ 121-22); (3) inelastic demand, (id. ¶¶ 123-24); (4) high concentration, (id. ¶¶ 125-29); (5) relative fungibility of residential real estate leases, (id. ¶ 130); (6) frequent exchange of competitively sensitive information among horizontal competitors, (id. ¶¶ 131-32); and (7) numerous opportunities to collude at trade associations and RealPage functions. (Id. ¶¶ 133-40). And other allegations in the Student Complaint constitute additional

plus factors that the Sixth Circuit has credited, In re Travel Agent Comm'n Antitrust Litig., 583 F.3d at 907 (citation omitted) (listing four plus factors), including: (8) that Lessors share a common motive to conspire, (id. ¶¶ 9, 11, 42, 140–142); and (9) that Lessors' conduct would otherwise be against each Lessor's independent economic interests.[15]  (Id. ¶¶ 61– 64).  As in the Multifamily Complaint, these last allegations, that Lessors' decision to set high prices during periods of high vacancy at the beginning of the student housing leasing cycle and keep those prices high would be contrary to their economic self-interest, carry significant weight.  See In re Travel Agent Comm'n Antitrust Litig., 583 F.3d at 907-908.

Defendants attack Plaintiffs' plus factors individually, but their objections to each are consistent.  (See Doc. No. 588 at 14-21; see also Doc. No. 643 at 4-11).  To Defendants, each alleged plus factor is "equally—in reality, more—consistent with unilateral, self-interested conduct than with a vast nationwide conspiracy." (Doc. No. 643 at 5; see also Doc. No. 588 at 14 ("Plaintiffs' allegations are in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.")).  Elsewhere, Defendants quibble over the weight of specific allegations, (see, e.g., Doc. No. 588 at 16 ("Mere opportunities to collude, even if '[n]umerous,' are not sufficient to support an inference of conspiracy")), and hold up others they see as contradictory.  (See e.g., id. at 15 (identifying allegations that Lessors had a record number of pre-leased in Fall 2022)).  But, as previously stated, separately evaluating each

_____

[15] Although Plaintiffs identify Lessors' change in pricing strategy as a plus factor, it is better understood as evidence of parallel conduct.  The Court will not "double-count" what it considers parallel conduct as plus factors or vice versa.  The Court will also not consider the alleged plus factor first raised in Plaintiffs' briefing regarding a federal investigation into RealPage.  The Student Complaint makes at best a cursory mention of this investigation, (see generally Doc. No. 527), and, tellingly, Plaintiffs fail to cite to a single allegation in the Student Complaint when urging the Court to consider the investigation as a plus factor.  (See Doc. No. 617 at 22–23).

factor is a legally flawed approach; the Court assesses these plus factors holistically. See Continental Ore Co., 370 U.S. at 698-99.

Applying the legally required holistic approach, see Continental Ore Co., 370 U.S. at 698-99, the Court finds that Plaintiffs' circumstantial evidence "plausibly raise[s] an inference of unlawful agreement." C.S. Sewell, 2018 WL 6591429, at *3 (M.D. Tenn. Dec. 14, 2018) (quoting Erie County, 702 F.3d at 869). Specifically, the Court finds that the Student Complaints' most compelling evidence of horizontal agreement are allegations that Lessors submitted real-time pricing and supply data to be compiled into a common algorithm, which was sent to all RealPage clients as "forward-looking, unit-specific pricing and supply recommendations based on their shared data" to achieve higher prices. (Doc. No. 527 ¶¶ 5, 15, 140, 142). These are precisely the same facts that the Court has already credited as the "most persuasive" in the Multifamily Complaint; their weight is no different here. Moreover, the individual Lessor's decision to contribute competitively sensitive data for the mutual benefit of RealPage's clients, including that Lessor's market competitors, is against its independent economic interest *unless* that Lessor knows that it will receive the benefit of their competitors' data in return. Other allegations reinforce the finding of a horizontal conspiracy:

- "RealPage provided the platform and the algorithm for collusion, which granted Lessor Defendants the unprecedented ability to '[f]acilitate collaboration among operations' and 'track your competition's rent with precision.' Lessor Defendants submitted to RealPage data that is 'as fine and granular as bits of sand.' Including rents charged for each unit and each floor plan, lease terms, amenities, [and] move-in and move-out dates. RealPage takes this data—'literally hundreds of variables,' according to founder and former CEO Steve Winn—and recommends a price for each unit that a lessor owns, giving Lessor Defendants the courage to charge inflated prices with the implicit assurance that all of their competitors will do the same." (Doc. No. 527 ¶ 9; see also id. ¶ 74 ("[I]t allows Lessor Defendants the 'confidence' to start the semester with prices at $450 and stay there, freeing them from reliance on 'blunt instruments such as tiered pricing or concessions. And it imposes this discipline on Lessors by relying on competitor pricing data. . . .")).

42

- "RealPage explained that its RMS software 'utilizes the competitive data' by 'comparing the effective rent you achieve to the top and bottom of the competitive range of your selected competitors.' RealPage even gave a sneak peek of the dashboard that property managers have access to, which included a view by competitor." (Doc. No. 527 ¶ 11; see also id. ¶ 69).

- Lessors reaffirmed their commitment to sharing confidential data with competitors to reap mutual benefit, when, on a monthly basis, Lessors fed sensitive data into RealPage systems. (See Doc. No. 527 ¶ 5 ("Each month, participants gave RealPage data on pricing, concessions, and other information for their own properties")).

- RealPage's pricing recommendations were almost universally accepted by Lessors, (see, e.g. id. ¶ 71 ("Greystar 'always wanted' Witness 1 and other property managers to accept RealPage's pricing recommendations, and Witness 1 did so approximately '98 to 99% of the time.")), and Lessors partnered with RealPage to implement measures to monitor Lessors' onsite workers and maintain high recommendation acceptance rates. (See id. ¶¶ 58, 59, 88 (making allegations specific to Greystar, Campus Advantage, and Cardinal Group)).

- RealPage encouraged its competing clients to "shop" their competition. (Id. ¶ 132).

These allegations support multiple plus factors that the Sixth Circuit has recognized, including Lessors' common motive to conspire and the exchange of commercially sensitive information. See In re Travel Agent Comm'n Antitrust Litig., 583 F.3d at 907 (quoting Re/Max Int'l, Inc., 173 F.3d at 1009); see also Todd, 275 F.3d at 198. Former Trade Commission Chair Maureen Ohlhausen's "guy named Bob" analogy is no less apt here; what matters is Lessor's knowledge that their information would be used to the mutual benefit of competitors—not their means of sharing that information. Read together, Plaintiffs' allegations support a "reasonable expectation that discovery will reveal evidence of [an] illegal agreement."[16] Twombly, 550 U.S. at 556.

---

[16] Just as the Multifamily Defendants, Student Defendants implore the Court to dismiss this case based on Gibson v. MGM Resorts International, 2023 WL 7025996 (D. Nev. Oct. 24, 2023). (Doc. No. 588 at 3, 6, 9). The Court's discussion of the distinctions between the allegations in the Multifamily Complaint and those in Gibson applies equally here. The Student Complaint specifically alleges that RealPage RMS relied on Lessors' competitors' competitively sensitive data to make its price recommendations. (See, e.g., Doc. No. 527 ¶¶ 67, 131).

### C.  Unreasonable Restraint of Trade

Once Plaintiffs sufficiently allege a conspiracy between Defendants, they must allege that the conspiracy unreasonably restrains trade.  See Hobart-Mayfield, Inc., 48 F.4th at 663.  To determine whether an alleged conspiracy unreasonably restrains trade, courts use one of two standards: the *per se* standard or the Rule of Reason.[17]   The Multifamily and Student Housing Complaints make allegations using both standards.  (See Doc. No. 530 ¶¶ 43, 706; see also id. ¶¶ 394, 409-680 (defining geographic markets for rule of reason standard); Doc. No. 527 ¶¶ 156, 222; see also id. ¶¶ 158, 164-97 (defining geographic markets)).

The Court separately analyses whether it must use the *per se* standard or the Rule of Reason to evaluate whether the Multifamily Complaint and the Student Complaint allege an unreasonable restraint of trade.  Prior to engaging in that analysis, the Court notes that many courts routinely decline to choose between the *per se* or Rule of Reason standards prior to discovery.  See, e.g., Int'l Constr. Prod. LLC v. Caterpillar Inc., 419 F. Supp. 3d 791, 807 (D. Del. 2019) (collecting cases).  Plaintiffs "do no[t] tether the viability of their claim to any one rule." In re Papa John's Employee & Franchisee Employee Antitrust Litig., 2019 WL 5386484, at *9 (W.D. Ky. Oct. 21, 2019).  The Court's analysis only determines whether Plaintiffs have sufficiently alleged their Sherman Act Section 1 claims, not which standard should control following discovery.

---

[17] The Complaints also allege review under the quick look standard, which is a condensed version of the Rule of Reason. Quick look analysis sits between the *per se* and rule-of-reason standards. It applies "when a restraint is not conclusively presumed illegal . . . but the likelihood of anticompetitive effects is . . . obvious." Realcomp II, Ltd. v. Fed. Trade Comm'n, 635 F.3d 815, 825 (6th Cir. 2011).  A quick look analysis "does not require elaborate industry analysis."  Id. (quoting Cal. Dental Ass'n v. Fed. Trade Comm'n, 526 U.S. 756, 770 (1999)) (internal quotation marks omitted).  "Under a quick-look analysis, once a restraint is deemed facially anticompetitive, the burden shifts to its proponent for justification on procompetitive grounds." Id. The motions to dismiss and the responses focus their arguments on the *per se* and rule of reason standards.  The Court does the same with its analysis.

44

### 1. *Per Se* Standard

The *per se* standard is reserved for conduct that is "so obviously anticompetitive that it has no plausibly procompetitive features." <u>Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.</u>, 922 F.3d 713, 718 (6th Cir. 2019). "[T]he *per se* rule should be applied only in clear cut cases of trade restraints that are so unreasonably anticompetitive that they present straightforward questions for reviewing courts." <u>Care Heating & Cooling, Inc. v. American Standard, Inc.</u>, 427 F.3d 1008, 1012 (6th Cir. 2005) (quoting <u>NHL Players Ass'n v. Plymouth Whalers Hockey Club</u>, 325 F.3d 712, 718 (6th Cir. 2003)) (internal quotation marks omitted). These clear-cut cases include price-fixing between horizontal competitors. <u>See Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.</u>, 48 F.4th 656, 666 (6th Cir. 2022). Courts have also applied the *per se* standard to hub and spoke price-fixing conspiracies. <u>See United States v. Apple, Inc.</u>, 791 F.3d 290, 323 (2d Cir. 2015). <u>See also Ogden v. Little Caesar Enters.</u>, 393 F. Supp. 3d 622, 632 (E.D. Mich. 2019). As the Second Circuit explained: "horizontal agreements with the purpose and effect of raising prices are *per se* unreasonable because they pose a threat to the central nervous system of the economy; that threat is just as significant when a vertical market participant organizes the conspiracy." <u>Apple</u>, 791 F.3d at 323 (quoting <u>United States v. Socony-Vacuum Oil Co.</u>, 310 U.S. 150, 224 n.59 (1940)) (internal quotations and citations omitted). "If the *per se* rule is applicable then no consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition." <u>Id.</u> (quoting <u>In re Cardizem CD Antitrust Litig.</u>, 332 F.3d 896, 907 (6th Cir. 2003)) (internal quotations removed).

### i. Multifamily Complaint *Per Se* Analysis

The Court finds that at this phase of the case, Multifamily Plaintiffs have not alleged a straightforward conspiracy justifying application of the *per se* standard. As explained above,

Plaintiffs have clearly alleged vertical agreements between RealPage and each of RMS Client Defendants, as well as some level of horizontal conspiracy among those RMS Client Defendants to each contribute their commercially sensitive pricing and supply data for use by RealPage to calculate their horizontal competitors' pricing recommendations. In turn, RealPage used horizontal competitors' commercially sensitive pricing and supply data to calculate their own pricing recommendations.

However, the Multifamily Complaint does not allege the dates that each RMS Client Defendant joined this conspiracy, and at least some became RealPage RMS clients years prior to the start of the alleged conspiracy. (See Doc. No. 530 ¶¶ 252, 292). Plaintiffs have not alleged any direct agreement or communications between RMS Client Defendants, though they have alleged indirect communications through several trade associations that may provide opportunities for these competitors to communicate. (See id. ¶¶ 383-86). Additionally, while Plaintiffs allege that RMS Client Defendants "delegate[d]" their pricing decisions to RealPage, (see Doc. No. 530 ¶ 6), they also allege that as much as 10-20% of the time, RealPage's clients deviate or override those pricing recommendations, (see id. ¶ 15). The Court cannot find that Plaintiffs have alleged an absolute delegation of their price-setting to RealPage. While the Court finds that Plaintiffs have alleged an aggressive scheme created by RealPage to monitor acceptance of its pricing recommendations, they have not alleged that either RealPage or any of RMS Client Defendants can enforce acceptance of price recommendations through removing an uncooperative member from the conspiracy or applying some other form of punishment. (See id. ¶¶ 16-20). All of these imperfections indicate that the conspiracy alleged is not the straightforward form of horizontal price-fixing conspiracy for which courts apply the *per se* standard. See In re Se. Milk Antitrust Litig., 739 F.3d at 271 ("The *per se* rule should only be used when the restraint has such predictable

and pernicious anticompetitive effect that there is limited potential for procompetitive benefit.")
(quoting State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)) (internal quotation marks omitted).

Moreover, courts are hesitant to apply the *per se* standard to new or "novel way[s] of doing business" that have not yet been tested or studied by economists to conclusively determine that these types of conspiracies are *per se* anticompetitive. In re Sulfuric Acid Antitrust Litig., 703 F.3d 1004, 1011 (7th Cir. 2012). The Court acknowledges that novel areas of industry do not "preclude *per se* treatment" when the conspiracy is a horizontal price-fixing agreement. See In re Cardizem CD Antitrust Litig., 332 F.3d 896, 908 (6th Cir. 2003)) ("[W]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.") (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222 (1940)) (internal quotations omitted). Here, the Court does not find the conspiracy alleged in the Multifamily Complaint to be a traditional straightforward price-fixing conspiracy. The Court thus finds that application of the *per se* standard is not appropriate based on the allegations in the Multifamily Complaint.

### ii.  Student Complaint *Per Se* Analysis

Student Plaintiffs have sufficiently alleged vertical agreements between RealPage and each of Lessors, as well as a horizontal conspiracy among Lessors to each contribute their commercially sensitive data to be used in calculating their horizontal competitors' pricing recommendations and to use their horizontal competitors' commercially sensitive data in calculating their own pricing recommendations.

Still, the Student Complaint does not make several allegations that would instruct *per se* treatment. It does not allege any direct agreement or communications between Lessors. At most, Student Plaintiffs have alleged Lessors were encouraged to "shop" each other's publicly available

47

prices, (Doc. No. 527 ¶ 132), and had the opportunity to become aware of their mutual use of RealPage and communicate in forums and at trade association events. (See id. ¶¶ 134-140). While the Student Complaint alleges that certain Lessors "always wanted" to adopt RealPage's recommendations and did so "98 to 99% of the time"—making departures from those recommendations even less likely than in the Multifamily Complaint—the Student Complaint does not allege that the RealPage pricing recommendations were in any way binding or enforceable on Lessors. (See generally Doc. No. 527). As it did for the Multifamily Complaint, the Court finds that the alleged scheme to monitor acceptance of RealPage's pricing recommendations relies on RealPage's monitoring and Lessors for internal enforcement; it does not provide Lessors means to discipline other supposed co-conspirators for failure to adhere to the alleged conspiracy. (See id. ¶¶ 84-93).

Given the recognition that courts are cautious in considering whether to apply *per se* treatment to new or novel ways of doing business, the Court does not find the conspiracy alleged in the Student Complaint to be a traditional straightforward price-fixing conspiracy. The Court finds that application of the *per se* standard is not appropriate based on the allegation in the Student Complaints.

### 2. The Rule of Reason Standard

Claims not subject to the *per se* standard are analyzed using the Rule of Reason, which is the default standard. In re Se. Milk Antitrust Litig., 739 F.3d 262, 273 (6th Cir. 2014). In contrast to the *per se* standard, claims analyzed under the Rule of Reason do not receive a presumption of anticompetitive conduct. "The rule-of-reason test requires the court to analyze the actual effect on competition in a relevant market to determine whether the conduct unreasonably restrains trade." Total Benefits Planning Agency, 552 F.3d at 436 (quoting Nat'l Soc'y of Prof'l Eng'rs, 435 U.S.

48

679, 692 (1978)).  Applying the Rule of Reason, Plaintiffs must allege that the conspiracy "produced anticompetitive effects within relevant product and geographic markets."  In re Se. Milk Antitrust Litig., 739 F.3d at 270.  At the motion to dismiss phase of a case, "[f]ull analysis under the rule of reason [is] not [] appropriate . . . given the fact intensive nature of that analysis."  Churchill Downs Inc. v. Thoroughbred Horsemen's Group, LLC, 605 F. Supp. 2d 870, 887 (W.D. Ky. 2009). Nonetheless, Plaintiffs must still allege the relevant markets and some degree of anticompetitive effects.  See Dunn & Mavis, Inc. v. Nu-Car Driveway, Inc., 691 F.2d 241, 245 (6th Cir. 1981) ("Since the complaint does not allege facts suggesting that [defendant's] refusal to deal had any significant anti-competitive effect on the market, there is no rule of reason case alleged."); United States v. Blue Cross Blue Shield of Michigan, 809 F. Supp. 2d 665, 672 (E.D. Mich. 2011).

 "The starting point in a rule of reason case is to identify the relevant product and geographic markets."  Techmatic, Inc. v. Plating Specialists, Inc., 2022 WL 16542106, at *14 (M.D. Tenn. Oct. 28, 2022) (quoting Statmore v. Goodbody, 866 F.2d 189, 194 (6th Cir. 1989)).  The boundaries of a product market are "gauged by (1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response . . . that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service."  Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917, 933 (6th Cir. 2005) (quoting White & White, Inc. v. American Hosp. Supply Corp., 723 F.2d 495, 500 (6th Cir. 1983)) (internal quotation marks omitted).  "Geographic market is defined as the region in which the seller operates, and to which the purchaser can practicably turn for supplies," in this case, housing.  In re Se. Milk Antitrust Litig., 739 F.3d at 277 (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)) (internal quotation marks omitted).  The process of determining the relevant

49

market is "fact-intensive and focused on the commercial realities of the industry." Id. (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 336 (1962)) (internal quotation marks omitted). As a result, "[r]elevant product or geographic markets are sufficiently alleged as long as the complaint bears a rational relation to the methodology courts prescribe to define a market." Blue Cross Blue Shield of Michigan, 809 F. Supp. 2d at 672 (quoting Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001)) (internal quotations omitted). The Court will only dismiss the complaint for failure to plead relevant markets if the definitions are "facially unsustainable." CoStar Group, Inc. v. Commercial Real Estate Exchange Inc., 2023 WL 2468742, at *4 (C.D. Cal. Feb. 23, 2023) (quoting Newcal Indus., Inc. v. Ikon Off. Sol., 513 F.3d 1038, 1045 (9th Cir. 2008).

Once the relevant product and geographic markets are defined, the Rule of Reason uses a burden-shifting framework:

> The plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

In re Papa John's Employee and Franchisee Employee Antitrust Litig., 2019 WL 5386484, at *9 (W.D. Ky. Oct. 21, 2019) (quoting Ohio v. American Express Co., 138 S. Ct. 2274, 2284 (2018)).

Plaintiffs can meet their initial burden of pleading a substantial anticompetitive effect through either direct or indirect evidence. See American Express Co., 138 S. Ct. at 2284. Direct evidence is "proof of actual detrimental effect on competition . . . such as reduced output, increased prices, or decreased quality in the relevant market." Id. (quoting FTC v. Indiana Federation of Dentists, 476 U.S. 447, 460 (1986)) (internal quotations and citations omitted). Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition." American Express Co., 138 S. Ct. at 2284.

50

If Plaintiffs meet their burden of pleading anticompetitive effects, Defendants must put forward procompetitive justifications for the alleged conspiracy. Id. "A procompetitive rationale is a [1] nonpretextual claim that the defendant's conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 986 (9th Cir. 2023) (quoting FTC v. Qualcomm Inc., 969 F.3d 974, 991 (9th Cir. 2020)) (internal quotation marks omitted). Procompetitive justifications may include "the creation of efficiencies in the operation of a market or the provision of goods and services," Realcomp II, Ltd., 635 F.3d at 834, or the enhancement of the "character and quality of the product." Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 832 (3d Cir. 2010). See also Medical Center at Elizabeth Place, LLC, 922 F.3d at 728 (listing defendants' procompetitive goals of joint venture agreement as including "provid[ing] a broad scope and a continuum of health care services with a focus on community health benefit"; and "improv[ing] cost effectiveness and efficiencies in the delivery of health care services," among others). Defendants must show why these procompetitive effects "establish that the alleged conduct justifies the otherwise anticompetitive injuries." Care Heating & Cooling, Inc., 427 F.3d at 1012 (quoting NHL Players Ass'n, 325 F.3d at 718). At the motion to dismiss phase, this analysis is adapted accordingly.

### i. Multifamily Complaint Rule of Reason Analysis

#### a. Product Market

Multifamily Plaintiffs define the relevant product market as "the market for the lease of multifamily residential real estate." (Doc. No. 530 ¶ 394). They argue that the multifamily housing rental market is appropriate because other forms of housing are not adequate substitutes for a multifamily rental unit. For instance, multifamily apartment buildings often include amenities and security, whereas single-family rentals typically do not. (Id. ¶ 396.) Apartments, condominiums

51

and homes for purchase are also not viable substitutes, as the "purchase of real estate requires the ability to make a substantial down payment and to obtain financing," neither of which is a prerequisite to renting an apartment. (Id. ¶ 395). Moreover, "RealPage itself differentiates the multifamily residential real estate market as a separate and distinct market from other residential markets [including] . . . affordable, military, senior, single-family, and student housing, as well as commercial properties." (Id. ¶ 397). Defendants do not dispute the product market defined by Plaintiffs. (See Doc. No. 593 at 30-32). The Court finds that Plaintiffs have adequately pleaded the relevant product market at this phase of the case.

### b. Geographic Market

As for the geographic scope of the multifamily housing market, Plaintiffs allege the scope is the entire United States; however, they allege the United States market is broken into submarket Metropolitan Statistical Areas (MSAs) because "[r]enters in any given MSA do not consider multifamily residential leases in other MSAs as adequate substitutes for multifamily residential leases in their own MSA." (See Doc. No. 530 ¶¶ 405-408). MSAs are established and defined by the United States Census Bureau and the Office of Management and Budget. An MSA is "a geographic entity associated with at least one core urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties." (Doc. No. 530 ¶ 407). Plaintiffs specifically allege that the conspiracy harmed competition in "at least" 45 MSAs.[18] (Id. ¶¶ 409-680).

_____

[18] These MSAs are Nashville, Tennessee; Atlanta, Georgia; Austin, Texas; Baltimore, Maryland; Boston, Massachusetts; Charlotte, North Carolina; Chicago, Illinois; Dallas, Texas; Denver, Colorado; Detroit, Michigan; Houston, Texas; Jacksonville, Florida; Las Vegas, Nevada; Los Angeles, California; Memphis, Tennessee; Miami, Florida; Milwaukee, Wisconsin; Minneapolis, Minnesota; New York, New York; Orlando, Florida; Philadelphia, Pennsylvania; Phoenix, Arizona; Pittsburgh, Pennsylvania; Portland, Oregon; San Diego, California; San Francisco, California; San Jose, California; Seattle, Washington; St. Louis, Missouri; Tampa, Florida;

52

Defendants argue that Plaintiffs' MSAs are implausible geographic markets because they are not delineated in a way that accounts for the highly localized nature of the market for multifamily housing. (Doc. No. 593 at 30-31). As one peculiar example, Defendants argue that the New York, New York MSA, which "spans parts of New York, New Jersey, and Pennsylvania," is too broad because "[i]t defies credulity for Plaintiffs to allege that a renter who lives and works in New York City's Financial District, who walks to work and does not own a car, would consider any apartment in Pennsylvania to be a reasonable substitute." (Id. at 31-32). Defendants do not support their contention that Plaintiffs' MSAs must account for individuals as specific as those "work[ing] in New York City's Financial District, who walk[] to work and do[] not own car[s]." (Id.). Instead, they offer an inapposite case, Cupp v. Alberto-Culver USA, Inc. Cupp concerned an alleged conspiracy over the sale of salon beauty products, and the court held that the complaint "*neglect[ed] entirely* to define a geographic market" because the plaintiffs alleged both the international sales of the beauty products and the plaintiff's "own inability to attain" those products in the localized Memphis, Tennessee region. 310 F. Supp. 2d 963, 970 (W.D. Tenn. 2004) (emphasis added).

Here, there is no disconnect between Plaintiffs' alleged geographic markets like there was in Cupp. Plaintiffs allege that RealPage's RMS are used by property owners and managers across the United States, and then they divide that market into submarkets consisting of MSAs to approximate the geographic areas in which multifamily housing renters may use to identify alternative housing. (Doc. No. 530 ¶ 400). As Plaintiffs observe, Defendants' argument that

Tucson, Arizona; Washington, D.C.; Wilmington, North Carolina; Birmingham-Hoover, Alabama; Buffalo, New York; Cincinnati, Ohio; Cleveland, Ohio; Columbus, Ohio; Hartford, Connecticut; Riverside, California; Sacramento, California; Salt Lake City, Utah; San Antonio, Texas; San Juan, Puerto Rico; and Virginia Beach, Virginia. (Doc. No. 530 ¶¶ 410-680).

53

Plaintiffs' MSAs are too broad is atypical. (Doc. No. 623 at 35). Ordinarily, defendants object to geographic markets as too narrow because if a market is too narrowly defined a plaintiff may be able to demonstrate market power where none actually exists. See, e.g., Re/Max Intern., Inc., 173 F.3d at 1007, 1016 (upholding district court's finding of no support for plaintiff's claim that "each of the 161 cities and towns in northeast Ohio was its own geographic market"). Thus, even if Plaintiffs' geographic markets are too broadly defined at this juncture in the case, that broadness does not harm Defendants. If anything, it disadvantages Plaintiffs in the market power analysis.

Defendants use two distinguishable cases to support their argument that the use of MSAs as geographic markets is inappropriate. (See id.). Those cases are not analogous to this case. In United States v. Connecticut National Bank, the Supreme Court held that in a merger between two local banks that provided services in different towns within Southeastern Connecticut, it was inappropriate for the district court to define the relevant geographic market as the entire state of Connecticut. 418 U.S. 656, 668-69 (1974). The Court further held that in redefining the geographic area, the government should not rely upon MSAs, without more justification, because MSAs "are prepared . . . to determine areas of economic and social integration, principally on the basis of the commuting patterns of residents[,] [and] are not defined in terms of banking criteria, . . . [or] developed as a tool for analyzing banking markets." Id. at 670. Unlike the banking markets at issue in Connecticut National Bank, the "commuting patterns of residents" have a direct relationship to the markets in which individuals may search for alternative housing.

White & White, Inc. v. American Hospital Supply Corp. concerned an alleged conspiracy between a hospital supply company and several hospitals, which the plaintiffs alleged resulted in the exclusion of other supply companies from the market. 723 F.2d 495, 498 (6th Cir. 1983). Following discovery and a trial, the Sixth Circuit overturned the district court's definition of the

54

relevant geographic markets (which relied upon MSAs) because the hospital supply companies admitted their sales reach was far greater, with more than half of their sales occurring outside the MSA in which they were located in some instances. Id. at 504. White & White simply underscores the importance that discovery will play in this fact-intensive inquiry and the need to reexamine the geographic markets at summary judgment.[19] It does not, as Defendants argue, prohibit Plaintiffs from using MSAs as the relevant geographic market when MSAs meet the market definition of "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." Id. at 501 (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)).

Moreover, there are plenty of circumstances in which courts find the use of MSAs as geographic markets to be appropriate. For instance, one court condoned the use of MSAs in a case brought by medical providers who alleged that Blue Cross Blue Shield entities conspired to allocate their insurance markets and reduce their reimbursement rates. In that case, the plaintiffs alleged that MSAs are "used in the ordinary course of business in the insurance industry when examining local markets." In re Blue Cross Blue Shield Antitrust Litig., 2017 WL 2797267, at *11 (N.D. Ala. Jun. 28, 2017). A court deciding a motion to dismiss in another case, which concerned an alleged antitrust conspiracy between a grocery chain and an advertiser, determined the plaintiff's "market definition [using MSAs] is not implausible based on its allegations, and defendants' arguments are more suited for a motion for summary judgment than a motion to dismiss." Insignia Systems, Inc. v. News America Marketing In-Store, Inc., 2006 WL 1851137, at *5-6 (D. Minn. Jun. 30, 2006). Like those courts, the Court finds that Multifamily Plaintiffs

---

[19] Indeed, the White & White record was "voluminous" and "[t]he trial consumed 80 trial days, required 43 witnesses, produced 800 exhibits and generated almost 15,000 pages of transcript." 723 F.2d at 498.

have plausibly alleged the relevant geographic markets. Discovery will aid the parties in more precisely defining these markets, if necessary, but they are certainly not facially implausible.

### c. Anticompetitive Effects

The Court now examines whether Multifamily Plaintiffs have plausibly alleged anticompetitive effects of the alleged conspiracy, which they can do using either direct or indirect evidence. See American Express Co., 138 S. Ct. at 2284. "If [direct evidence of] adverse effects are clear, inquiry into market power is unnecessary." Realcomp II, 635 F.3d at 827. Plaintiffs attempt to show direct evidence of anticompetitive effects through their parallel pricing graphs. (Doc. No. 530 ¶¶ 337-50; Doc. No. 623 at 31-32). However, as previously discussed, these graphs fail to show a supracompetitive increase in rent prices that indicates price increases that cannot be explained by normal market forces. As the Supreme Court explained in Twombly, allegations in a complaint must "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Thus, the allegations of increased rent prices are not plausible direct evidence of anticompetitive effects of the alleged conspiracy. See 1-800 Contacts, Inc. v. FTC, 1 F.4th 102, 118 (2d Cir. 2021) ("We reject the Commission's argument that it has established direct evidence of anticompetitive effect in the form of increased prices. When an antitrust plaintiff advances an antitrust claim based on direct evidence in the form of increased prices, the question is whether it can show an actual anticompetitive change in prices after the restraint was implemented.")

Because Plaintiffs have not proffered plausible direct evidence of anticompetitive effects, they must allege through indirect evidence that Defendants have market power in the relevant markets and "have adopted policies *likely* to have an anticompetitive effect." Realcomp II, Ltd., 635 F.3d at 825 (emphasis in original). "[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects

56

on competition, and this is so precisely because actual anticompetitive effects may be difficult to demonstrate." Id. at 828 (quoting Indiana Federation of Dentists, 476 U.S. at 460) (emphasis in original) (internal quotation marks omitted). Defendants argue that Plaintiffs have not shown RealPage has market power in Plaintiffs' alleged submarkets for two reasons: (1) Plaintiffs' market power calculations are based on a faulty assumption, (see Doc. No. 593 at 35-36); and (2) even accepting Plaintiffs' market power calculations, in several of the alleged submarkets, Plaintiffs allege market power of 30% or less, which Defendants argue is not a sufficient showing, (see id. at 34-35).

Defendants' first argument concerns the method Plaintiffs used to calculate their allegations of market power in each of the 45 alleged submarkets. Plaintiffs calculation is as follows: (1) Plaintiffs determined, where available, the percentage of "[p]roperty management companies and owners who use revenue management software" in each market; (2) then Plaintiffs applied the assumption that "RealPage's RMS accounts for over two-thirds of revenue management software used in the U.S. multifamily housing industry" by (3) then calculating two-thirds of the property owners/managers using some form of revenue management software in each submarket to determine an estimated percentage of those who specifically use RealPage's RMS. (See, e.g., Doc. No. 530 ¶ 412). Thus, Plaintiffs' calculations are based on an assumption that RealPage accounts for "over two-thirds of all revenue management usage" not just across the United States, but also in each submarket. (Id. ¶ 218 and n.113). Defendants argue that this assumption is faulty because it is based on a 2017 earnings call transcript where RealPage's then-CEO, Steve Winn, said:

> RealPage has about 1,500,000 units on our product, and LRO has about the same number. And Yardi has a little less, but they've got a sizeable footprint. And the point, the 3 of us, we only represent 70—a little north of 70—30% of the market. The rest of the market is using proprietary software systems.

57

(Doc. No. 593 at 36). According to Defendants, Winn's statement should be interpreted to mean that RealPage accounts for less than 30% of the "market." (Id.). But the statement, which is inherently ambiguous, can also be read to support Plaintiffs' interpretation that, at least as of June 2017, RealPage and LRO represented just under 70% of the market. Further adding to the statement's ambiguity, it is not clear whether the "market" to which Mr. Winn referred was the revenue management software market or some portion of the greater housing market. The Court finds, at the motion to dismiss stage of the case, that Plaintiffs' calculations of market power, based in part on Mr. Winn's statement, are plausible given their limited access to information and without the benefit of any discovery. Discovery will reveal RealPage's true market power in each of its alleged markets.

Defendants also challenge the extent of the market power Plaintiffs allege. The Multifamily Complaint alleges that RealPage sets prices for between 25% and 53% of multifamily units in 33 of the MSA submarkets. (Doc. No. 530 ¶¶ 410-619). For the remaining 12 submarkets, the Multifamily Complaint alleges that "[d]iscovery will demonstrate that property owners and managers who use revenue management software account for a significant portion of all multifamily rental units in the [relevant] Submarket, though Plaintiffs have not been allowed to purchase data regarding specific market share numbers." (Id. ¶¶ 620-74). The Multifamily Complaint further alleges that "[w]hile traditional antitrust doctrine uses market share as a rough proxy for market power, that proxy does not tell the full story in the multifamily residential real estate market." (Id. ¶ 400). Defendants have "greater market power at lower market share levels than might be the case in other industries" because "there are considerable search, transaction, and relocation costs associated with moving" and "because of the staggered nature of the rental leases,

58

many of the units nominally part of the housing stock in a given metropolitan area will not actually be available to a renter at the time of their lease renewal." (Id.).

According to Defendants, courts are reluctant to find an adequate showing of market power when a defendant controls less than 30% of the market. (Doc. No. 593 at 34). Five of Plaintiffs' alleged submarkets have a market share of less than 30% based on Plaintiffs' calculations. (See Doc. No. 530 ¶¶ 469, 500, 512, 549, 590).[20] The case Defendants rely on, however, is not specific to the housing context and does not address Plaintiffs' allegations concerning the high costs to renters of moving and that only a portion of the total units in a market are available for rent at any given time. See PSI Repair Services, Inc. v. Honeywell, Inc., 104 F.3d 811, 818 (6th Cir. 1997). Moreover, Plaintiffs rely on at least one case where the court found a market share as low as 17% could constitute market power. See Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 667 (7th Cir. 1987). The Court finds, again, that Plaintiffs have met their burden of alleging market power prior to discovery. Discovery will reveal the appropriate percentage of market share needed to presume market power and the actual percentage RealPage enjoys in each of Plaintiffs' alleged submarkets.

The Court finds that Plaintiffs have met their initial burden of showing that Defendants' alleged conspiracy has had anticompetitive effects in the relevant markets.

### d. Procompetitive Justifications

Defendants make only a fleeting reference to procompetitive justifications in their opening brief, arguing that "Plaintiffs concede several procompetitive reasons why every [RMS Client] Defendant would independently decide to use RealPage's RMS and why it would be profitable to

---

[20] These submarkets are Detroit, Michigan (25%); Memphis, Tennessee (26%); Milwaukee, Wisconsin (26%); Pittsburgh, Pennsylvania (26%); and St. Louis, Missouri (28%). (Id.)

59

do so in the absence of a conspiracy." (Doc. No. 593 at 12). These "procompetitive reasons" include that RMS is "an advisory product that can help users maximize asset value and reduce vacancy," "eliminates manual research into market conditions and other manual tasks," and "manages inventory to avoid large numbers of residents moving in or out of a property at the same time." (Id.). At oral argument, Defendants' counsel reiterated these "procompetitive reasons," describing them as "maximizing revenue, which can be through increasing price, increasing occupancy, [and] smoothing out vacancies." (Doc. No. 673 at 93:6-10).

Plaintiffs argue that "[n]one of the procompetitive rationales" offered by Defendants "are actually procompetitive under the antitrust laws. They're all about making more money for the defendants." (Id. at 179:3-8). At the motion to dismiss phase, the Court agrees. Defendants conflate the concept of procompetitive justifications with independent reasons RMS Client Defendants would use RealPage's RMS apart from creating a price-fixing conspiracy.[21] Procompetitive justifications concern impacts on the market, not on an individual market player. See Epic Games, Inc., 67 F.4th at 986. In this way, they are analogous to an antitrust injury, which concerns the harm to the market rather than harm to an individual. See Expert Masonry, Inc. v. Boone County, Ky., 440 F.3d 336, 346 (6th Cir. 2006) ("antitrust injury, the concept that lies at the very heart of antitrust law, is different from the ordinary meaning of tortious injury in the commercial context. The antitrust laws . . . were enacted for the protection of *competition*, not *competitors*.") (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977)) (internal quotation marks omitted) (emphasis in original). Defendants' proffered justifications

---

[21] As the Court previously discussed, Plaintiffs need not exclude the possibility of independent, non-nefarious reasons for each Defendant to use RealPage's RMS at this stage of the case; Plaintiffs need only plead a plausibility of conspiracy, which they have done.

only concern Defendants themselves—their desires to maximize revenue, syncopate move-out dates, and reduce their own administrative costs. Defendants have offered no explanation for how their desires benefit the market as a whole. Thus, Defendants have failed their burden of offering procompetitive justifications for Plaintiffs' alleged anticompetitive effects.

Because Defendants have not offered procompetitive justifications, the Court need not determine whether Plaintiffs have "demonstrate[d] that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." In re Papa John's Employee & Franchisee Employee Antitrust Litig., 2019 WL 5386484, at *9 (quoting American Express Co., 138 S. Ct. at 2284). Even so, Plaintiffs easily meet this burden by alleging that RealPage could exclude horizontal competitors' sensitive pricing and supply data from its RMS price recommendations, as at least one RealPage client, AvalonBay, has done. (See Doc. No. 530 ¶¶ 219-20).

For the reasons above, the Court finds that Multifamily Plaintiffs have plausibly alleged an unreasonable restraint of trade using the Rule of Reason standard at this phase of the case.

### ii. Student Housing Complaint Rule of Reason Analysis

#### a. Product Market

The Student Complaint defines the relevant product market as "the market for lease of student housing real estate." (Doc. No. 527 ¶ 158). This market is different from multifamily rental apartment units because, among other things, student housing properties are more affordable, offer tenants a leasing cycle that aligns with the school year, and allow tenants to lease by the bed rather than the unit. (Id. ¶ 159). Likewise, because apartments, condominiums, and houses for purchase require down payments and financing unless the purchaser has the means to pay in cash—which students very rarely have—homes for purchase are not economic substitutes

61

for student housing.  (Id.).  Defendants do not dispute this product market as defined.  (See Doc. No. 588 at 23-27).  The Court finds that the Student Complaint has sufficiently pleaded the relevant product market.

### b.  Geographic Market and Market Power

Plaintiffs allege a geographic market scope of the entire United States. (Doc. No. 527 ¶ 158).  The Student Complaint further alleges that 27 regional submarkets comprising cities and towns home to colleges and universities around which RMS Client Defendants operate student housing rental properties.[22]

Defendants argue that the Student Complaint fails to allege a proper geographic market because its allegations are contradictory and self-defeating.  (Doc. No. 588 at 26).  The supposed nationwide market is undercut by Plaintiffs' claims that the markets for student housing are tied to the institutions students attend.  (Id.).  For this same reason, the regional submarkets comprising entire cities are overbroad, as students would likely forgo student housing near a different university on the opposite side of town in favor of other housing options closer to the institution they attend, such as dormitories or multifamily housing.  (Id.).  Defendants use the proposed regional submarket of San Antonio to demonstrate this shortcoming: "Plaintiffs allege no facts plausibly suggesting that students at the suburban campus of the University of Texas-San Antonio

---

[22] These cities and towns are Austin, Texas; Tallahassee, Florida; Columbia, South Carolina; Knoxville, Tennessee, Eugene, Oregon; Auburn, Alabama; Gainesville, Florida; Baton Rouge, Louisiana; Champaign, Illinois; State College, Pennsylvania; College Station, Texas; Huntsville, Texas; Tuscaloosa, Alabama; Madison, Wisconsin; Wilmington, North Carolina; San Antonio, Texas; Seattle, Washington; College Park, Maryland; New Haven Connecticut; West Lafayette, Indiana;  East Lansing, Michigan; Bloomington, Indiana; Greensboro, North Carolina; Arlington, Texas; Louisville, Kentucky; Fort Collins, Colorado; and Pullman, Washington.  (Doc. No. 527 164–91).  Student Plaintiffs indicate that other markets exist that are currently unknown to them. (Id. ¶ 164 n.179).

would consider 'student housing' located near San Antonio College, a different university fifteen miles away in downtown San Antonio." (Id.)

Plaintiffs explain that their allegations of a nationwide market both align with their *per se* argument and are necessary to alert Defendants to other submarkets yet to be identified for the purposes of the Rule of Reason analysis. (Doc. No. 617 at 31-32). But this explanation does not justify the alleged market within the Rule of Reason analysis. As Defendants point out, Plaintiffs allege, "students are a captive market: they need to live near the school campus." (Doc. No. 527 ¶ 2). If determining the relevant market is fact-intensive and focused on the commercial realities of the industry, which, indeed, it is, In re Se. Milk Antitrust Litig., 739 F.3d at 277, Plaintiffs' proposal of a nationwide market does not contend with, and in fact confounds, this alleged reality. See id. (quoting Tampa Elec. Co., 365 U.S. at 327 ("Geographic market is defined as the region in which the seller operates, and to which the purchaser can practicably turn for supplies"). The Court finds Plaintiffs' proposed nationwide market implausible.

Plaintiffs fall back on their 27 regional submarkets to attempt to rebut Defendants' argument that the markets are too broad. (Doc. No. 617 at 32). They argue that Defendants "cherry-picked" the San Antonio example, which is an outlier from among their regional submarkets. (Id.). According to Plaintiffs, because just fewer than half of their regional submarkets contain only one campus, the San Antonio example only "serves to highlight that disposition of relevant market is inappropriate at the pleading stage." (Id.). But this argument is of no moment. Plaintiffs readily acknowledge that submarkets must be defined as the region where a student would turn to for student housing near his or her campus, and Plaintiffs offer no rebuttal to Defendants' commonsense point that a student would all but certainly look outside the student housing market if the only housing available in that market was located several miles from his or

63

her campus or on another campus altogether. (Id.). The decision to include San Antonio as a regional submarket—along with several other submarkets with campuses several miles apart, see id. (admitting that other submarkets contain campuses between five and eight miles apart)—rests entirely with Plaintiffs.

To their credit, Plaintiffs correctly point out that defendants ordinarily object to geographic markets as too narrow rather than too broad because the illusion of market power may appear in a too-narrowly defined market. Re/Max Intern., Inc. 173 F.3d at 1007, 1016. By naming potentially overbroad regional submarkets, Plaintiffs voluntarily put themselves at a disadvantage. As Plaintiffs succinctly state in their brief, "if the geographic market definition is too large, that would only understate market power in the relevant market." (Doc. No. 617 at 32). Multifamily Plaintiffs make a similar argument in response to Defendants' objection to their geographic markets, as the Court discussed above. This commonsense broadness argument, however, does not negate a plaintiffs' requirement to plead a plausible geographic market. The Multifamily Complaint alleges plausible markets based on MSAs, which are "measured by commuting ties." (Doc. No. 530 ¶ 407). In contrast, Student Plaintiffs offer no explanation for how large cities containing multiple universities, as opposed to markets confined to a reasonable perimeter around each campus, meet the geographic market standard of "the region in which the seller operates, and to which the purchaser can practically turn for [housing]." In re Se. Milk Antitrust Litig., 739 F.3d at 277 (quoting Tampa Elec. Co., 365 U.S. at 327) (internal quotation marks omitted). Student Plaintiffs' alleged geographic markets are not plausible.

Even if Student Plaintiffs' geographic markets were plausible, Plaintiffs fail to allege facts demonstrating market power in their proposed regional submarkets. The Student Complaint alleges that the market satisfies the SSNIP test, which dictates that if a hypothetical monopolist in

a proffered market could profitably impose a small but significant, non-transitory increase in price while staying profitable, the market is properly defined. (Doc. No. 527 ¶¶ 160-62). Plaintiffs argue they satisfy the SSNIP test because RealPage's RMS has allowed Lessors to have a 2% to 7% revenue outperformance in the United States student housing market. (Id.; see also Doc. No. 617 at 33). The Student Complaint also alleges admissions by Defendants that RealPage RMS allowed Lessors to outperform the market, and a "preliminary economic regression" estimated an average overcharge of 10.9% on properties that were priced using YieldStar Student compared to benchmark properties in Auburn, Baton Rouge, Tallahassee, and Eugene. (Doc. No. 527 ¶¶ 15, 47-48, 66, 77, 141-42).

The Court cannot ignore that Student Plaintiffs tie their allegations exclusively to the proposed nationwide market and offer no market power analysis for their regional submarkets. Indeed, Plaintiffs admitted this fact during argument on the motions:

> The Court: So the only allegations you have about market power pertain to the national market, not any of the regional markets?
>
> Mr. Berman: Well, there's - there's -- you mean the SSNIP test? Relates to the national.

(Doc. No. 673 at 124:1-7).

> The Court: Okay. But again, there's no specific allegations about specific market power in any of the submarkets?
>
> Mr. Berman: There is not, Your Honor.

(Id. at 124:25-125:3).

With no allegations specific to any of the regional submarkets, (id.), Plaintiffs ask the Court to infer regional submarket market power based on the same alleged admissions by Defendants they claim demonstrate nationwide market power:

> Mr. Berman: No. What we would be relying on to show market power is just the defendants' admissions that they've been able to raise profits and rents at above

65

market levels.  And since they all operate in the submarkets, it's logical to infer that those rents are being raised in these submarkets.

The Court: I'm sorry.  What's logical to infer?

Mr. Berman:  Well, if they're saying - we know that these defendants operate in these markets.  Okay?  And they're promoting themselves as profiting having rent increases above normal because of RealPage.  So it had to have occurred in these submarkets.

(Id. at 124:12-24).

Although the request for this inference is nowhere in Plaintiffs' briefing, (see generally Doc. No. 617), the Court considers these admissions as part of Plaintiffs' effort to show market power in the regional submarkets.[23]   Unfortunately for Plaintiffs, all but one of these admissions concern revenue, not price.  (Compare Doc. No. 527 ¶¶ 15, 77 (repeating the same allegation from a case study performed by RealPage and Defendant Campus Advantage); with id. ¶¶ 47, 48, 66 (discussing either increasing revenue or outperforming the market generally)).   And the only allegation on price concerns a single property in a single year.  (See id. ¶¶ 15, 77 (citing a case study that purports to show "how a 576-bed property outperformed the market by 14.1% with a negative YoY occupancy change" in 2017)).   This does not plausibly allege—or permit the inference of—market power across the regional submarkets over the supposed 13-year conspiracy.

### c.  Direct Evidence of Anticompetitive Effects

Because Student Plaintiffs have not plausibly alleged market power, they cannot allege anticompetitive effects through indirect evidence.   Plaintiffs must instead rely entirely on the allegations of direct evidence to sustain their claim under the Rule of Reason.  See American

---

[23]  The Court will not do the same for Plaintiffs' so-called preliminary regression analysis. Plaintiffs' brief uses that analysis exclusively to demonstrate Defendants' market power only in the proposed nationwide market, (Doc. No. 617 at 33), and Student Plaintiffs' attorney did not state otherwise at oral argument.  (Doc. No. 673 at 124:12–125:3).

Express Co., 138 S. Ct. at 2284. From both their briefing and oral argument, it is clear that this is where Plaintiffs prefer to make their stand. As Plaintiffs explained in their briefing, "an inquiry into market power is a surrogate for detrimental effects[,]" and where "adverse effects are clear, inquiry into market power is unnecessary." (Doc. No. 617 at 28-29 (citing Realcomp II, 635 F.3d 827-28)). Plaintiffs also led with this point at oral argument. (See Doc. No. 673 at 121:13-14 ("Mr. Berman: First[,] I would say we don't have to get to market power")).

To show direct evidence of anticompetitive effects, Plaintiffs point to seven allegations from the Student Complaint that rely upon "Defendants' admissions that they have achieved 'above market' [performance] using RealPage's pricing," (see Doc. No. 617 at 29 (citing Doc. No. 527 ¶¶ 15, 47, 48, 66, 77, 142, 161)) and to their so-called "preliminary econometric regression." (Doc. No. 617 at 29). The Court will address each.

Plaintiffs overstate the import of the admissions that Defendants achieved above market performance using RealPage RMS. As previously stated, several of these allegations either repeat the same admission or concern revenue, not prices. [24] These statements support, at most, that: (1) RealPage has stated at various times that its revenue management software yielded a 2% or 3% to 7% revenue outperformance in the market, (Doc. No. 527 ¶¶ 15, 47, 142, 161); (2) Greystar stated in a testimonial that "over the last 10 years, spanning about 150 projects, the services that RealPage provided have equated to a return on investment of about 300% on about 90% of those projects," (Doc. No. 527 ¶¶ 15); and (3) "RealPage describes its AIRM software as 'the industry's only price

---

[24] At oral argument, Student Plaintiffs pointed to two more allegations in their complaint that demonstrate increased prices. (See Doc. No. 673 at 116:15–117:5 (referencing Doc. No. 527 ¶¶ 105, 107)). However, one of those allegations also concerns revenue rather than price. (See Doc. No. 527 ¶ 107). The other referenced increased annual effective rent in 2022 compared to recent years but does not attribute the increase to RealPage as opposed to other market forces. (Doc. No. 527 ¶ 105).

optimization solution powered by next-generation data that makes it possible to consistently reduce vacancies and maximize rents,' [and] explain[s] that it 'outperforms the market 2%-5%.'" (Doc. No. 527 ¶ 48). The only statement that concerns price is contained in single case study performed by RealPage and Defendant Campus Advantage, which reported that a single Campus Advantage building outperformed the market by 14.1% "with a negative [year over year] occupancy change" in 2017. (Doc. No. 527 ¶¶ 15, 66, 77, 142).

Plaintiffs' preliminary regression analysis provides no better support for their claims. As alleged, Plaintiffs performed a regression analysis that compared publicly available rental prices in one month—August 2023—for student housing owned or managed by RMS Client Defendants in Auburn, Baton Rouge, Tallahassee, and Eugene with properties operated by non-Defendants whom Plaintiffs presume do not use RealPage RMS. (Doc. No. 527 ¶ 141). According to Plaintiffs, the "regression controlled for various property and geographic features, including the size of the unit and the distance of the property from the university." (Id.). The regression concluded that, on average, RMS Client Defendants overcharged by 10.9% compared to the properties that presumably did not use RealPage RMS. (Id.). Defendants challenge the regression analysis because Plaintiffs "do not identify all the variables tested, the number of properties analyzed, or whether there was more than a single day of asking-price observations." (Doc. No. 588 at 14). Plaintiffs also provide a chart that shows the average rent of one bedroom, two bedroom, and studio units across the four regional submarkets and across RMS Client Defendants and non-defendant student housing operators.[25] (Id.). As Defendants observe, the regression and

---

[25] On its face, the chart does not appear to take into account the "various features" that the regression considered, such as size of the unit and the distance of the property from the university. (See Doc. No. 527 ¶ 141 (organizing average rent prices only by floorplan and whether they are owned or managed by a Lessor Defendants or non-defendants.))

the chart combine the data of each RMS Client Defendant and each of the four selected regional submarkets, obscuring which data belongs to any one RMS Client Defendant or any one submarket. (Doc. No. 588 at 28).

Plaintiffs argue that the critique of its regression as too narrow is wrong and assert that allegations like their regression have been accepted by other courts. (Doc. No. 617 at 30). But by comparing their regression to the evidence in Brown v. JBS USA Food Co., 2023 WL 6294161, at *9-14 (D. Colo. Sept. 27, 2023), Plaintiffs only highlight the weaknesses in their regression analysis. In Brown, a wage suppression case, the plaintiffs alleged that, in 2017, base wages were increased by only 2% in each of 17 identified plants operated by seven defendants and, in 2018, base wages were increased by only 2% in 17 plants operated by several defendants, including some of the plants that only received a 2% increase in base wages in 2017. Id. at *4. The plaintiffs in Brown also alleged that in those same years, "at plants operated by different [d]efendants, the difference in average wages between plants in the same areas including Dodge City, Kansas; the Oklahoma and Texas panhandles; and south-central Nebraska decreased, bringing the difference in wages between closely located plants within $0.07 or less." Id. Here, Plaintiffs' regression focuses on only four RMS Client Defendants in four cities in a *single month* over a 13-year alleged conspiracy. This is a far cry from the specific, year-over-year evidence that strikes at the heart of the alleged conspiracy in Brown. This can be of little surprise to Plaintiffs' counsel, who also serves as counsel in Brown. (Doc. No. 673 at 180:6-7).

Taken together, Plaintiffs' allegations of price increases fall short. After setting aside Plaintiffs' irrelevant allegations, the Court is left with four it can consider: (1) an allegation concerning the touted performance of a single building owned by one Lessor despite a negative occupancy rate in 2017, (Doc. No. 527 ¶¶ 15, 66, 77, 142); (2) an allegation the annual effective

69

rent increased at a higher rate in 2022 than it had in recent years, (id. ¶ 105); (3) Plaintiff's "regression" that purports to show a 10.9% overcharge in four cities in a single month in 2023, (id. ¶ 141); and (4) an allegation that one Lessor credits RealPage RMS with increasing its prices by roughly 5%. (Id. ¶ 58). These allegations are far too narrow to plausibly support Plaintiffs' claims of a 13-year conspiracy occurring in college towns and cities across the United States. The first pertains to a single building in one year; the notion that this single building's performance is representative of the rest of Campus Advantage's properties' performance across time, let alone of other Lessors' properties' performance, is implausible. The second is impossible to disentangle from regular market forces like inflation to carry significant weight for 2022, and it carries no weight for the other 12 years of the alleged conspiracy. The third is both so narrow and so recent that, even taken as true, it does not support the conclusion Plaintiffs claim it does. The fourth—which Plaintiffs' counsel never cited as evidence of anticompetitive effects—does not allege that the increased prices led to supracompetitive pricing.

For the reasons stated, Plaintiffs' allegations fail to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. The allegations of increased rent prices are not plausible in light of Plaintiffs' allegations of direct evidence of anticompetitive effects of the alleged conspiracy. See 1-800 Contacts, Inc., 1 F.4th at 118.

As a result, the Court concludes that Plaintiffs' fail to adequately plead an unreasonable restraint of trade under the Rule of Reason. See American Express Co., 138 S. Ct. at 2284 (explaining that the Rule of Reason requires either direct or indirect evidence of anticompetitive effects). The Court need not reach Defendants' procompetitive justifications. Id. Moreover, because the Student Complaint fails to allege a necessary element of a Sherman Act Section 1 claim, it must be dismissed.

70

**D. Antitrust Injury**

Both the Multifamily and Student Defendants relegate their arguments on antitrust standing to a single page. The two cohorts rely on the same case law and, at times, the same wording. (<u>compare</u> (Doc. No. 588 at 31-32); <u>with</u> (Doc. No. 593 at 37-38)). However, because the Court has determined that the Student Complaint fails to state a Sherman Act Section 1 claim, the Court only addresses the issue of antitrust standing as it applies to the Multifamily Complaint.

As in <u>NicSand, Inc. v. 3M Co.</u>, "[o]f the various requirements for establishing antitrust standing, the one that concerns us here is antitrust injury." 507 F.3d 442, 450 (6th Cir. 2007). (<u>See also</u> Doc. No. 593 at 38 (concluding "[t]hat Plaintiffs allegedly paid 'higher' rental prices— during a time of extraordinary inflation, no less—does not establish antitrust injury.")). "Not all injuries are necessarily antitrust injuries," and "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." <u>Assoc. Gen. Contractors of California, Inc. v. California State Counsel of Carpenters</u>, 459 U.S. 519, 534 (1983) (internal quotation marks and citation omitted). Accordingly, "[a]n antitrust injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible because of the violation." <u>Gelboim v. Bank of America Corp.</u>, 823 F.3d 759, 772 (2d Cir. 2016) (quoting <u>Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. at 489) (internal quotation marks omitted). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." <u>Id.</u>

Defendants assert that the Multifamily Complaint fails to plead an antitrust injury because "Plaintiffs continue to make only vague, conclusory allegations that they paid 'higher' rental prices" but "do not allege specific facts casually connecting any of those 'higher' prices to the

purported critical mechanism of the alleged conspiracy: RealPage RMS." (Doc. No. 593 at 37). Because Plaintiffs do not allege that any RealPage RMS was used to set their individual rents and RMS Client Defendants had discretion as to whether to accept RealPage's pricing recommendations, Defendants say, Plaintiffs could be part of the minority of renters who did not contract for a recommended price.[26] (Doc. No. 588 at 32; and Doc. No. 593 at 38). But, at such an early stage of litigation, this argument is unavailing.

The Multifamily Complaint alleges that: each Plaintiff leased directly from one of Defendants, (Doc. No. 530 ¶¶ 50-60); Defendants used RealPage RMS, (id. ¶¶ 67-193); Defendants adopted RealPage's pricing recommendations 80 to 90% of the time, (id. ¶ 15); and each Plaintiff "paid higher rental prices by reason of" Defendants' anticompetitive price-fixing conspiracy. (Id. ¶¶ 50-60). What's more, the Multifamily Complaint alleges that "the inevitable outcome of coordinated price setting . . . [i]s that rents have been pushed above competitive levels." (Id. ¶ 21). After all, RealPage's appeal to RMS Client Defendants was its promise that they would "outperform the market," primarily through raising rent prices.

Of course, discovery may lead the Court to the opposite conclusion; whether Plaintiffs' individual rents were set pursuant RMS recommendations and, if not, whether those rents were still inflated by the alleged conspiracy remains to be seen. But such issues must be left to later stages of the litigation.

## II. State Law Antitrust Claims

The Court addresses Defendants' arguments for dismissing the Multifamily and Student Complaint's state law antitrust claims simultaneously.

---

[26] This argument is premised on the baseless assumption that, when RMS Client Defendant departed from RealPage RMS's recommended price, it adopted a price consistent with ordinary market conditions.

72

Defendants acknowledge that the majority of state antitrust laws track the Sherman Act and cases interpreting it. (See Doc. No. 593 at 38 n.19; Doc. No. 588 at 32 n.13). They contend that "Plaintiffs' state antitrust claims fail for the same reasons their Sherman Act claims do." (Doc. No. 593 at 38; see also Doc. No. 588 at 32). Because the Court finds that the Multifamily Complaint has plausibly alleged an antitrust conspiracy in violation of the Sherman Act, the Court similarly finds that, subject to the exceptions below, Plaintiffs' state law claims are adequately pleaded at this stage of the case. Conversely, because the Court finds that the Student Complaint has failed to plausibly allege its Sherman Act claim, the Court finds that is has also failed to plausibly allege antitrust claims under state law.[27]

Defendants argue that some state antitrust laws are narrower than the Sherman Act and thus provide separate grounds for dismissal of those state law claims. The Court must address whether Multifamily Plaintiffs, while sufficiently pleading a Sherman Act claim, have failed to plead claims under any of these narrow state laws. Before it addresses these arguments, the Court notes that the parties each spent less than three pages of their briefing on Plaintiffs' claims pursuant to the laws of 43 states. (See Doc. No. 593 at 38-40; Doc. No. 623 at 38-40; Doc. No. 530 ¶¶ 715-57). The Court summarizes its findings to date concerning the state law issues raised by Defendants' brief, but the Court cannot rule upon any of the state law claims without appropriate briefing.

Most significantly, Multifamily Defendants allege that Multifamily Plaintiffs lack standing to sue under state law in several states because either (1) no named Plaintiff resided in that state during the Class Period; or (2) none of the markets Plaintiffs have alleged exist in those states.

---

[27] To the extent that any of the Student Plaintiffs' state law claims survive, the Court declines to exercise supplemental jurisdiction over them. 28 U.S.C. § 1367(c)(3).

(Doc. No. 593 at 39-40). "Outside the class-action context, a plaintiff must demonstrate standing for each claim he seeks to press." In re: McCormick & Co., 217 F. Supp. 3d 124, 143 (D.D.C. 2016) (quoting DaimlerChrylser Corp. v. Cuno, 547 U.S. 332, 352 (2006)) (internal quotation marks omitted). Within the class action context, the law of standing is murkier. See id. at 143-44 (detailing how "courts have split on how to handle class actions in which named plaintiffs seek to represent classes bringing state-law claims in states where the named plaintiffs do not reside"). The parties' briefing does not provide the Court with any guidance concerning how the Sixth Circuit instructs courts to determine standing of named plaintiffs in the class action and/or multi-district litigation context. In the absence of guidance from the parties, the Court agrees with the District Court for the District of Columbia that "[i]t is more logical to consider named plaintiffs' ability to raise other state-law claims as a question of commonality, typicality, and adequacy under Rule 23, rather than [as] a question of standing." Id. at 144.

Next, Defendants argue that Georgia and Pennsylvania do not allow for private antitrust claims. (See Doc. No. 593 at 33). Plaintiffs respond that "the laws of Pennsylvania and Georgia permit antitrust claims pursuant to either a private right of action or a common law tort action." (Doc. No. 623 at 38). As to Pennsylvania, Plaintiffs cite Pennsylvania's Unfair Trade Practices and Consumer Protection Law to support their argument, but that statute does not pertain to antitrust violations such as price-fixing. See, e.g., 73 Pa. § 201-2(4) (defining unfair trade practices). Through its own analysis, the Court has determined that Pennsylvania does not have an antitrust statute, and Pennsylvania courts, as well as federal courts interpreting Pennsylvania common law, have consistently held that Pennsylvania does not allow for damages for common law private rights of action alleging antitrust violations. See Presque Isle Colon and Rectal Surgery v. Highmark Health, 391 F. Supp. 3d 485, 503-04 (W.D. Pa. 2019). As to Georgia, the Court's

74

independent research indicates that, contrary to Defendants' argument, Georgia does recognize a common law tort challenging contracts restraining trade if the plaintiff alleges a conspiracy to injure the plaintiff. See Atlanta Fiberglass USA, LLC v. KPI Co., 911 F. Supp. 2d 1247, 1261 (N.D. Ga. 2012); Diverse Power, Inc. v. City of LaGrange, Georgia, 2018 WL 9651475, at *7 (N.D. Ga. Feb. 21, 2018) ("To have standing to challenge the enforceability of an allegedly anticompetitive contract, the plaintiff either must be a party to the agreement or otherwise allege that the contracting parties conspired to injure the plaintiff."). However, the parties have not offered, and the Court has not independently found, any precedent concerning whether Georgia recognizes a common law tort for alleged horizontal conspiracies, like here, where no contract exists between the horizontal competitors. The Court will not do the parties' homework for them.

Defendants further argue that "Plaintiffs have not sent a pre-suit demand letter as required by Massachusetts's unfair and deceptive practices statute which is a bar to suit." (Doc. No. 530 at 39 (quoting Entrialgo v. Twin City Dodge, Inc., 333 N.E.2d 202, 204 (Mass. 1975)). Plaintiffs do not respond to this argument. (See Doc. No. 623 at 38-40). The Court's own research confirms that Massachusetts' law concerning "Regulation of Business Practices for Consumers Protection"[28] requires that "[a]t least thirty days prior to the filing of [a private action], a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent." Mass. Gen. Laws ch. 93A § 9(3). It is not clear from the parties' briefing, however, which, if any, of Plaintiffs alleging violations of Massachusetts law sent demand letters to which,

---

[28] Unlike Pennsylvania's consumer protection law, Massachusetts' law concerns "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct or any trade or commerce" and is intended to be "guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act." Mass. Gen. Laws ch. 93A § 2(a)-(b).

if any, of Defendants in this action. The Court is thus unable to determine whether the Massachusetts state law claim should be dismissed without further information from the parties.

Defendants additionally argue that several states have shorter statutes of limitations for antitrust claims, including Louisiana, Indiana, Kansas, and South Carolina. (See Doc. No. 593 at 39). But they do not argue or provide any evidence that Plaintiffs have failed to meet those shorter statutes of limitations or that the Complaint "affirmatively show[s] that the claim[s] are time-barred." Cataldo v. U.S. Steel Corp., 676 F.3d 542, 547 (6th Cir. 2012). Again, the Court is thus unable to determine whether these claims should be dismissed on statute of limitations grounds.

Finally, Defendants raise one additional state law argument for which the briefing is so deficient that the Court can make no assessment at this time: whether antitrust claims brought under Tennessee, South Carolina, Indiana, and Massachusetts law "apply only to goods or articles." (See Doc. No. 593 at 39). Plaintiffs dispute that any of these state laws provide such a limitation. (See Doc. No. 623 at 39).

## CONCLUSION

For the foregoing reasons, the Court will grant the Student Defendants' Motion to Dismiss the Student Rentals First Amended Complaint and will deny Multifamily Defendants' Motion to Dismiss the Multifamily Rentals Second Amended Complaint.

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

76